CATHARINE M. WHITE

*v.*

FRANCIS T. SHERMAN *et al.*

*Opinion filed November 1, 1897.*

168   589
182   103
182   109

168   589
202  12  93

168   589
211   489

1. TRUSTS—*trustee cannot invest in stocks or bonds of private corporation.* In the absence of express provisions in the statute or in the instrument creating the trust, a trustee cannot invest the trust funds in stocks, bonds or other securities of private corporations.

2. SAME—*trustee must act with discretion—speculative risks prohibited.* A trustee, in the investment of the funds of his trust, must act in good faith and use sound discretion and reasonable vigilance, all speculative risks with such funds being forbidden.

3. SAME—*trustee must protect himself by order of court.* A trustee appointed by court must select such securities for the investment of the funds of his trust as the court appointing him will approve.

4. SAME—*cestui que trust may follow the trust funds when improperly invested.* A *cestui que trust* has his election to either follow trust funds into an unauthorized investment made by his trustee and take the benefit of such investment, or to hold the trustee personally liable for his breach of trust.

5. SAME—*trustee cannot invest funds in his individual name.* Investing trust funds in the individual name of the trustee is a breach of trust, regardless of the trustee's intention in the premises, and subjects the trustee to the same liability as a willful conversion.

6. SAME—*acquiescence by beneficiary in improper investment—burden of proof.* A trustee who would excuse himself for breach of trust on the ground of acquiescence by the *cestui que trust,* has the burden of showing, by full and satisfactory proof, that the *cestui que trust,* at the time of such acquiescence, was under no disability, and that he acted with a full knowledge of the facts, freely, deliberately and advisedly, with the intention of confirming a transaction which at the time he knew he had the right to impeach.

7. SAME—*acquiescence by life tenant does not bind remainder-man.* Acquiescence by a tenant or *cestui que trust* for life in a misappropriation of trust funds by the trustee does not bind the person entitled to the remainder.

8. SAME—*what is not an acquiescence by beneficiaries.* Merely telling beneficiaries of the difficulty of loaning the trust funds and suggesting the purchase of railroad stocks therewith, to which one beneficiary, with the concurrence of the others, replied that the trustee should "use his own judgment," is not sufficient to show acquiescence in the purchase of fluctuating railroad stocks by the trustee

without an order of court, and will not estop the beneficiaries to treat such purchase as a breach of trust and call for an accounting.

9. SAME—*trustee should seek direction of court as to investments.* A trustee appointed by court to execute the provisions of a will should call for the direction of the court in the matter of investing the funds of the trust estate, and cannot justify the purchase of railroad stocks in his own name with such funds, without such direction, by showing a probable necessity, in the exigencies of the stock market, of closing out such purchase quickly and before an order of court could be obtained.

10. SAME—*proper basis of accounting by trustee for misappropriated funds—interest.* A trustee is liable to the beneficiaries in the trust, upon an accounting in equity for trust moneys invested without authority in railroad stocks, with interest thereon at legal rates from the dates of the respective investments, with annual rests, less deductions for all dividends received on such stocks and accounted for with a like allowance of interest.

11. SAME—*trustee must account for profits arising from the trust.* A trustee holding trust property to be insured, who joins an underwriters' association and thus secures a commission on the premiums paid for such insurance, must account, as trustee, for such commissions, less fees paid for membership in such association, even though the trust estate suffered no loss by the transaction.

12. RES JUDICATA—*when former adjudication is a bar.* To constitute a bar, a former adjudication must have been upon a matter actually in issue, the determination of which was essential to the judgment.

13. SAME—*preliminary recital in decree on matter not in issue is not an adjudication.* A mere preliminary recital in a decree entered by consent upon a bill praying the appointment of a successor to a deceased trustee, that the deceased had "faithfully discharged his duties as such trustee," etc., will not preclude a subsequent accounting in equity for moneys which the trustee had improperly invested in railroad stocks.

*Sherman* v. *White,* 62 Ill. App. 271, affirmed.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

This is a bill, filed on April 15, 1895, by James H. Swan, trustee of the trust estate created by the will of Francis C. Sherman, deceased, and by the children and grandchil-

dren of said testator, against the plaintiff in error, Cath-
arine M. White, as executrix and sole legatee under the
will of the late Hugh A. White, deceased, for the purpose
of compelling the defendant to account for and turn over
to said Swan, as such trustee, certain moneys, claimed to
be due from said White's estate to said trust estate.   The
bill seeks to recover $29,450.00, which Hugh A. White, as
trustee of the Francis C. Sherman estate, invested in cer-
tain railroad stocks in 1888; it also seeks to recover cer-
tain sums of money, which White is charged with having
received as commissions on insurance effected upon the
trust property.   An answer was filed by Catharine M.
White on April 16, 1895, to which answer a replication
was filed.   After the coming in of the answer the bill was
amended, and, by agreement, the answer as originally
filed was to stand as the answer to the bill as amended.
On May 16, 1895, the cause was referred to a master in
chancery, who took testimony and made a report.   In his
report the master found against the right of the com-
plainants to recover from the estate of White the origi-
nal amount paid for the stocks, upon the alleged ground
that said complainants were estopped from disavowing
the acts of the trustee in purchasing said stocks; but
the report found that the estate of White was chargeable
with the commissions on insurance premiums received by
him.   Objections were filed to the report before the mas-
ter, and exceptions thereto were filed in the circuit court.
Upon the hearing before the circuit court upon the excep-
tions to the master's report, the circuit court entered a
decree confirming the report of the master, except that
it allowed the estate of White credit for certain member-
ship fees, admitted to have been paid by White as a mem-
ber of a certain underwriters' association; and except
that it modified such report in certain minor particulars
not now in controversy.   The decree of the circuit court
found, that it was the duty of Swan, as successor in trust,
to receive said railroad stocks and the dividends thereon

as the property of the trust estate, and directed that the plaintiff in error, Mrs. White, should endorse and deliver the same to him as such trustee; and that he should accept the same in full satisfaction of any claims on the part of said Sherman estate by reason of the purchase of said stocks by said White. The decree also found, that plaintiff in error, as executrix aforesaid, was chargeable with the amount received by White as such commissions, as above mentioned, less such amount paid by him for membership fees as aforesaid; and plaintiff was ordered to pay over to said Swan $2596.04, being the net amount of such commissions less membership fees, as above stated, with interest from April 27, 1894, and the further sum of $145.50 with interest from said date. Upon appeal to the Appellate Court, the latter court affirmed that part of the decree of the circuit court relating to the commissions on insurance premiums, but in all other respects reversed the decree of the circuit court, and remanded the cause, with directions to the circuit court to enter a decree, charging plaintiff in error with the $29,450.00, invested by said White in railroad stocks, making proper deductions for dividends received thereon; and allowing interest with annual rests on sums so invested from the date of the investment at the rate of six per cent per annum until July 1, 1891, and thereafter at the rate of five per cent less the deductions for all dividends received, with like interest; and with directions to order the payment by plaintiff in error to said trustee, Swan, in due course of administration, of the sum so ascertained, in addition to the sum allowed on account of insurance commissions and interest. The present appeal is prosecuted from the judgment so entered by the Appellate Court.

While the case was pending in the Appellate Court, Swan, the trustee, died, and Edward H. Reed, his successor in trust, having been duly appointed by the decree of the circuit court, was made a party to this cause in the place of said Swan.

The facts necessary to an understanding of the questions involved in this cause are as follows:

Francis C. Sherman died testate on November 7, 1870, leaving him surviving his widow, Electa Sherman, and his three children, Francis T. Sherman, George C. Sherman and Martha S. Marsh, his only heirs-at-law. The widow, Electa Sherman, has since died; and George C. Sherman, one of the sons, has also since died. The latter at the time of his death left no widow, nor any child, nor any descendant of a child. Francis T. Sherman and Martha S. Marsh are the only surviving children of said testator. Francis T. Sherman has four children, namely: Frances Ella Marsh, wife of Eben J. Marsh, Lulu M. Aldrich, wife of J. Frank Aldrich, Francis C. Sherman, whose wife is Myra Sherman, and Eaton G. Sherman, a bachelor. Martha S. Marsh has two children, namely, Ida S. Charles, wife of J. Joseph Charles, and Edwin Sherman, whose wife's name is Alida W. Sherman.

The will of Francis C. Sherman, deceased, provided, among other things, as follows:

"I do give, bequeath and devise my real estate in said city of Chicago known as the 'Sherman House property,' and described as lots seven (7) and eight (8), in block thirty-four (34), in original town (now city) of Chicago, in said county, with the hereditaments and appurtenances, to Joshua L. Marsh, of said city, as trustee, and to his successors, forever. In trust, however, for the following uses and purposes and upon the following conditions, namely: Upon my death to take possession of said Sherman House property, and collect and receive all the rents, issues and profits thereof then due or thereafter to become due, and upon the termination, in any manner, of the lease of any portion thereof, or upon any portion thereof becoming vacant, to rent the same to such person or persons and upon such terms and conditions as he may think best, provided that no lease or demise shall be for a longer term or period than ten years.

168—38

"I do hereby authorize said trustee to insure said property as he may think best, and in case the same, or any portion thereof, shall be injured or destroyed, by fire or otherwise, to repair or rebuild the same, and for that purpose to borrow money, if by him thought advisable or necessary, upon such terms and conditions, and for such time and times and in such amounts, as he may see fit, and to .execute and deliver any and all necessary notes, bonds, mortgages, deeds of trust or other instruments in writing to secure the payment of the same, upon said Sherman House property, and to renew or extend the time of payment of any such loan, or again borrow money for the payment of any such loan, or any I may have made on the same, and secure the same as aforesaid.

"After the payment of all taxes, rates and assessments legally levied, assessed or imposed upon said property, and all premiums for insurance, and all interest as it matures that may become due upon money borrowed for the purchase, improvement, rebuilding or repairing of said property, or that may have been borrowed by me and secured on said property, * * * and all reasonable charges and expenses attending the execution of this trust, I direct my said trustee to appropriate the remainder of such rents, issues and profits as follows: Until the indebtedness hereinbefore referred to for the purchase, improvement, repairing or rebuilding said property shall have been fully paid, I direct my said trustee to pay to my said wife the sum of $6000.00 per annum, and to each of my children living the sum of $3000.00 per annum, all payable quarter-yearly, and the remainder to the payment of said indebtedness. After said indebtedness shall have been fully paid, I direct said trustee to pay to my said wife, while living, one-third of such remainder, and divide the remainder among my children equally, and after her death to divide the whole of such remainder among my children equally. In case of the death of any of my said children, the heirs of his or her body, if any,

shall in all cases represent him or her and be entitled to his or her share.

"It is my desire, and I hereby direct, that my said trustee shall have, hold and manage said Sherman House property entire and undivided, and appropriate the rents, issues and profits thereof in the manner hereinbefore specified, during the natural life of my said wife and children, and until the death of the last survivor of them, and until the youngest child of any and all of my said children shall become and be of the age of twenty-one years, and then convey the same to the heirs of my said children, the heirs of each child representing and being entitled to one equal share.

"In case of the death, resignation, refusal or inability to act of said trustee, I hereby direct that a new trustee be appointed by the county court of said county, upon the application of any person interested and notice to all the other persons interested, with all the powers of said original trustee; and my trustee, before entering upon the duties of his trusteeship, shall enter into a bond, with good and sufficient security, to be approved by said court, in such sum as said court may determine, payable to some one of my heirs, for the benefit of all concerned, conditioned for the faithful performance of the duties of his trust, and file the same in the office of the clerk of said court.

"I direct that the compensation to be received by any trustee in said will contemplated, for the performance of any duty of any kind or description of such trustee, shall not exceed $1500.00."

Joshua L. Marsh, the trustee named in the will, qualified and acted as such until some time in 1875 when he resigned and George Taylor and Henry W. Leman successively were appointed as his successors. Leman served until July 15, 1885, when the circuit court of Cook county by decree declared the trust vacant, and appointed said Hugh A. White as trustee under the provisions of the

will. White qualified as such trustee in 1886, by entering into a bond in the sum of $50,000.00, conditioned for the faithful discharge of his duties, and acted as such trustee until March 24, 1894, when he died.

When White entered upon the duties of the trust on October 21, 1886, there was a mortgage upon the Sherman House property to the Northwestern Mutual Life Insurance Company of $450,000.00, payable July 1, 1892. The will required White, after payment of taxes, insurance, interest on borrowed money, etc., to accumulate the rents, and, after paying $3000.00 a year to each of the two children, Francis T. Sherman and Martha S. Marsh, to apply the remainder of the rents to the reduction of said mortgage. As the mortgage did not mature until July 1, 1892, rents accumulated in the hands of the trustee. White invested some of these accumulated rents in manner following, to-wit:

On February 25, 1888, White, the trustee, purchased, with funds belonging to the trust estate, one hundred shares of stock of the Chicago, Rock Island and Pacific Railroad Company for $11,300.00, taking the certificate therefor in his own individual name. This purchase was made through the firm of L. A. Carton & Co. On October 27, 1888, White likewise purchased, through the firm of Winchester & Co., an additional one hundred shares of the Chicago, Rock Island and Pacific railroad stock, and one hundred shares of Missouri Pacific Railroad Company's stock, using for such purchases $18,150.00 of the funds of said trust estate. The total amount thus paid by White for said three hundred shares of railroad stock was $29,450.00. When White died on March 24, 1894, he still had in his possession these railroad stocks; but their value had declined, so that their market value, at the time of his death, was only about $15,500.00; they have been declining in value ever since.

On April 23, 1894, Francis T. Sherman filed his bill in the circuit court of Cook county, making his children,

and his sister and her children, and plaintiff in error, the
defendants thereto, praying the court to appoint a new
trustee under the will as the successor of said Hugh A.
White, deceased; and also praying that plaintiff in error,
Catharine M. White, should be required to account with
such trustee in reference to said trust estate. On the next
day, April 24, 1894, a decree was entered by consent, find-
ing, among other things, that White in his lifetime had
made payments on the said mortgage amounting to $170,-
000.00, so that on January 1, 1894, there remained due
thereon the principal sum of $280,000.00; that an exten-
sion of the mortgage was also procured on July 1, 1892,
until July 1, 1902, with the privilege of paying off the
balance of the mortgage in installments of not less than
$20,000.00 on the first day of January in each year, after
first giving sixty days' notice of his intention so to do;
and which said consent decree appointed said James H.
Swan to be the trustee of said Sherman estate under said
will as successor in trust to said White; and ordered that,
within a certain time, said Catharine M. White, execu-
trix as aforesaid, should turn over to said Swan all the
papers, deeds, leases, books and documents of the estate
held by her, and pay over all moneys of the estate in her
hands, and account with the said Swan so appointed as
trustee. On April 25, 1894, Swan filed his bond, which
was duly approved, and entered upon his duties as such
trustee. Mrs. White turned over to Swan part of the
papers, etc., pertaining to said estate, and paid to him
the sum of $7791.83, belonging to said estate. But plain-
tiff in error claims, that the said three hundred shares of
railroad stock belonged to said trust estate, and should be
charged thereto at the cost thereof. She offers to trans-
fer to said Swan as trustee the certificates of stock in
payment of said sum of $29,450.00 used by White from
the funds of the Sherman estate for the purchase thereof.
The present bill seeks to compel plaintiff in error to pay
over the full amount of $29,450.00 which her husband in-

vested in the purchase of said stock; said Swan, as successor in trust, refuses to receive the depreciated stocks from plaintiff in error, and claims that White's estate is liable for the original cost thereof.

HARVEY B. HURD, for plaintiff in error:

If a trustee makes an improper investment with the knowledge, assent and acquiescence or at the request of the *cestui que trust,* he cannot be held to make good the loss, if one happens. 1 Perry on Trusts, sec. 467; *Sherman* v. *Parish,* 53 N. Y. 483; Hill on Trustees, 525, *et seq.;* Lewin on Trusts, 773,774; *Brice* v. *Stokes,* 11 Ves. Jr. 325.

Had the court acted for him and ordered the investment in the security which proved inadequate, the trustee would not have been more clearly blameless than when the *cestui que trust* gave the direction. 11 Am. & Eng. Ency. of Law, 841; *Poole* v. *Munday,* 103 Mass. 174; *Booth* v. *Booth,* 1 Beav. 125; *Brice* v. *Stokes,* 11 Ves. 319; *Walker* v. *Symonds,* 3 Swanst. 64; *Montfort* v. *Cadogan,* 17 Ves. 489; *Nail* v. *Punter,* 5 Sim. 555.

It has always been a principle of equity to discourage stale demands. *Laches* is often a defense wholly independent of the Statute of Limitations. Pomeroy's Eq. Jur. sec. 965; Kerr on Fraud and Mistake, 299-301; *Seley* v. *Rhoads,* 1 Bligh's Ch. 1; *Tash* v. *Adams,* 10 Cush. 252; *Fuller* v. *Melrose,* 1 Allen, 166.

A trustee is not chargeable with compound interest except where he has willfully violated his trust or used the money in his own business—as punishment. *Hughes* v. *People,* 111 Ill. 457.

If the beneficiary is *sui juris* and competent to bind himself, his consent to the irregular investment would be justification of the trustee's action, and a waiver of all claims against him from resulting loss. Pomeroy's Eq. Jur. sec. 1074; *Elling* v. *Marx,* 4 Fed. Rep. 673.

The language of Lord Hardwick in *Jackson* v. *Jackson,* 1 Atk. 513, is in point: "To compel trustees to make up

a deficiency not owing to their willful default is the hardest demand that can be made in a court of equity." See, also, *Knight* v. *Plymouth*, 3 Atk. 480.

The following cases hold that taking a note or bond in the trustee's own name is not a conversion: *Brown* v. *Dunham*, 11 Gray, 42; *Syme* v. *Badger*, 92 N. C. 706; *Armitage* v. *Metcalf*, 1 Eng. Ch. Cases, 74; *Richardson* v. *State*, 55 Ind. 381; Iredell on Executors, 613.

This court gives simple interest in cases where the trustee is not guilty of willful breach of trust. Perry on Trusts, sec. 468; *Lehman* v. *Rothbarth*, 111 Ill. 196; *Jenkins* v. *Doolittle*, 69 id. 415; *Young* v. *Bush*, 38 id. 294; 27 Am. & Eng. Ency. of Law, 179.

When the trustee receives no credit or profit from the act, or if the act was beneficial to the *cestui que trust*, legal interest will not be imposed upon the trustee. *Rapalje* v. *Hale*, 1 Sandf. Ch. 399; *Graves' Appeal*, 50 Pa. St. 189; *Bond* v. *Abbott*, 42 Ala. 499.

What White made he made out of his membership in the underwriters' association, and not out of nor to the disadvantage of the Sherman estate. When accurately stated the rule is as follows: A trustee shall not take advantage of his situation to obtain a personal benefit to himself at the expense of his *cestui que trust*. *Slow* v. *Law*, 3 Blatchf. 459; *Jamison* v. *Glascock*, 29 Mo. 191; *Parkist* v. *Alexander*, 1 Johns. Ch. 394.

A trustee cannot use his position to make a profit out of his *cestui que trust*. *Wychoff* v. *Wychoff*, 44 N. J. Eq. 56.

BAYLEY & WEBSTER, for defendants in error:

The investment of trust funds by a trustee in speculative securities constitutes a breach of trust, and the trustee is liable for the loss thereby occasioned. Pomeroy's Eq. Jur. sec. 1070, *et seq.;* Perry on Trusts, secs. 452, 454, 456, 459; *Mattocks* v. *Moulton*, 84 Me. 545; *Adair* v. *Bremmer*, 74 N. Y. 539; *King* v. *Talbot*, 40 id. 76; 2 Story's Eq. Jur. secs. 1273, 1278; *Simmons* v. *Oliver*, 74 Wis. 633.

When a trustee has in fact converted trust funds to his own use, or without authority has invested the trust funds in any other property into which such funds can be distinctly traced, the *cestui que trust* has his election either to follow the same into the new investment or to hold the trustee personally liable for the breach of trust. Perry on Trusts, secs. 470, 471; *Oliver* v. *Pratt*, 3 How. 332; *Breit* v. *Yeaton*, 101 Ill. 242; 2 Story's Eq. Jur. sec. 1262; 11 Am. & Eng. Ency. of Law, 837, note 2.

Conduct in relation to the trust property which is fraudulent in its nature or tendency is deemed to be the individual conduct of the trustee, and its consequences, if injurious, are imputed to him personally, and his own estate will be held. 27 Am. & Eng. Ency. of Law, 193.

It is important, too, to observe the distinction in respect to the trustee's liability, between a trustee whose control of the property is absolute and one who is the mere repository of the legal title. One who is in possession is held to a strict accountability. 27 Am. & Eng. Ency. of Law, 194.

Evidence of acquiescence, in cases like this, must be full and satisfactory. The same strictness is required as in proof of other dealings between trustee and *cestui que trust.* Kerr on Fraud, (Bump's ed.) 297, 299-301, 307.

The *cestui que trust* must be shown to have been apprised of his legal rights in order to bind him by ratification. 2 Pomeroy's Eq. Jur. sec. 1083, note, and cases cited; *Adair* v. *Bremmer*, 74 N. Y. 554.

The trustee must see to it that all the *cestuis que trust* concur, in order to protect him from a breach of trust. 1 Perry on Trusts, sec. 285.

On the authority of *Bennett* v. *Colley*, 5 Sim. 181, and of *Bowen* v. *Evans*, 1 J. & L. 265, the authorities formerly held that a remainder-man could not acquiesce in an investment until his interest falls into possession, so as to be bound. 1 Perry on Trusts, sec. 467; Bispham's Hill on Trustees, 528; Kerr on Fraud, (Bump's ed.) 312.

In Bispham's Hill on Trustees, 526, it is said that imperfect information will be regarded as equivalent to concealment. Again, it is a general principle that a person is not estopped by his silence when there is no positive duty or opportunity to speak. 7 Am. & Eng. Ency. of Law, 13, note, and cases cited; 1 Perry on Trusts, sec. 467.

Mere delay short of the period fixed as a bar by the Statute of Limitations will not preclude the assertion of an equitable right. *Gibbons* v. *Hoag*, 95 Ill. 69; *Henry County* v. *Drainage Co.* 52 id. 458.

The question of the liability of the trustee for these investments, so far as is shown by the evidence, was never raised, and therefore no ratification or acquiescence can be claimed. Kerr on Fraud, (Bump's ed.) 301; *Bennett* v. *Colley*, 2 M. & K. 225; *Burrows* v. *Walls*, 5 D., M. & Y. 233; *Life Ass.* v. *Siddall*, 3 D., F. & J. 58.

Even when the trustee has unlimited discretion in the investment of trust funds he cannot invest in securities not sanctioned by a court of equity. *Mattocks* v. *Moulton*, 84 Me. 545; *Simmons* v. *Oliver*, 74 Wis. 633; Perry on Trusts, secs. 452, 454, 459, 460; 2 Story's Eq. Jur. (12th ed.) 1273.

A trustee must account for all profits which may come to him by dealing with the trust property, even for bonuses or gratuities given him by strangers for contracts made with them in relation to the trust property. 1 Perry on Trusts, sec. 209, and cases cited; 27 Am. & Eng. Ency. of Law, 194, 196, and cases cited; Pomeroy's Eq. Jur. sec. 1075, notes, and cases cited; *Jacobus* v. *Munn*, 38 N. J. Eq. 622; *Dodd* v. *Wakeman*, 26 id. 487; Story on Agency, secs. 207-211; *Bent* v. *Priest*, 10 Mo. App. 543.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The questions involved in this case relate to the liability of the estate of Hugh A. White, deceased, growing out of his purchase of three hundred shares of railroad stocks with the funds of the Sherman trust estate, and

growing out of his collection of commissions upon premiums paid by him for insurance upon the property of the trust estate. Did White, as trustee of the Sherman estate, have the right, or was he authorized, to invest the funds of the estate in the railroad stocks in question? Did White, as such trustee, have the right to appropriate to his own use such commissions so as aforesaid received by him?

*First*—The will of Francis C. Sherman is silent as to the mode of investing the rents accumulating prior to the date for the application thereof upon the mortgage resting upon the property. Where there are no express directions in the instrument creating the trust, and no statutory provisions, in relation to the character of the securities in which trust funds may be invested, a trustee cannot invest such funds in stocks, bonds or other securities of private business corporations. In England, trustees are required to invest trust funds in real estate securities, or in the public securities of the British government. In this country the same requirement, in regard to making investments in real estate securities or government securities, is generally recognized by the courts. At any rate, "all speculative risks are forbidden." (2 Pomeroy's Eq. Jur. sec. 1074). The rule is, that, in the investment of trust funds, the trustee must not only act in good faith and use sound discretion and reasonable vigilance, but, where he is appointed by a court and is acting under the directions of a court, he must select such securities as the court will approve. (11 Am. & Eng. Ency. of Law, p. 814).

In the case at bar, the evidence shows that the railroad stocks, in which the trustee, White, invested the trust funds of the Sherman estate, were very fluctuating and speculative. In fact one of the witnesses speaks of them as being "wild cat" securities. The speculative character of these securities was well known to the trustee, White. White dealt in such stocks through brokers

for more than six years before his death, buying and sell-
ing the same to the amount of about $2,000,000.00; the
amount of money, however, which actually changed hands
in the buying and selling of said stocks of the actual cash
value of $2,000,000.00, was only about $50,000.00. After
he made his first purchase of these stocks on February
25, 1888, to-wit: of the one hundred shares of Chicago,
Rock Island and Pacific railroad stocks, and before he
made his second purchase on October 27, 1888, such stocks
had begun to decline. The one hundred shares first pur-
chased were bought at $113.00 per share, but in July, 1888,
such stocks had declined in value to a sum less than
$107.00 per share. Notwithstanding this decline, White
in October made another investment in the same class
of securities by purchasing an additional one hundred
shares of said Chicago, Rock Island and Pacific railroad
stock.

*Second*—The evidence is clear, that all the railroad
stocks so purchased by White were purchased in his own
individual name, and not by him as trustee of the estate.
The certificates, made out when the stock was issued to
him, were made out in his own name, and he appeared
upon the books of the company, issuing the stocks, as the
individual owner thereof, and not as the owner thereof
in trust for the estate of which he was the trustee. In
all his communications with the beneficiaries in the trust
for whom he was acting, whether such communications
were made to them orally or by written report, he con-
cealed, or failed to mention, the fact that the stocks stood
in his own name.

When a trustee has in fact converted trust funds to
his own use or without authority has invested the trust
funds in any other property into which such funds can
be distinctly traced, the *cestui que trust* has an election
either to follow the same into the new investment, or to
hold the trustee personally liable for the breach of trust.
(2 Story's Eq. Jur. secs. 1262, 1263; *Breit* v. *Yeaton,* 101 Ill.

242). Whatever the actual intention of the trustee may be, the weight of authority seems to be, that, where he invests trust money in his individual name, he commits a breach of trust, which subjects him to the same liability, as if there had been a willful conversion to his own use. (*Morris* v. *Wallace*, 3 Pa. St. 319; *Stanley's Appeal*, 8 id. 431; *McAllister* v. *Commonwealth*, 30 id. 536; 2 Pomeroy's Eq. Jur. sec. 1079; *Gilbert* v. *Welsch*, 75 Ind. 557; *Naltner* v. *Dolan*, 108 id. 500, and cases cited; *DeJarnette* v. *DeJarnette*, 41 Ala. 708). The doctrine is a familiar one, that every presumption is indulged against the trustee who has personal dealings with the trust. Where the conduct of the trustee in relation to the trust property is fraudulent in its tendency, as well as in its nature, its consequences, if injurious, are imputed to the trustee personally, and his estate will be held liable therefor. (27 Am. & Eng. Ency. of Law, 193, 196).

The authorities are uniform to the effect, that the trustee may not deposit the trust funds in his own name. When he has converted the trust funds to his own use by investing them in his own name, he will be held to a strict accountability for the conversion, and the trust will follow the investment at the option of the *cestui que trust.* In such cases a strict accounting will be exacted from him. (27 Am. & Eng. Ency. of Law, pp. 160-163; *McDonnell* v. *Harding*, 7 Sim. 177; *Massey* v. *Banner*, 1 Jacob & W. 241; 2 Pomeroy's Eq. Jur. 1076; *Jenkins* v. *Walter*, 8 G. & J. 218; *Summers* v. *Reynolds*, 95 N. C. 404; *Syme* v. *Badger*, 92 id. 706; *Brown* v. *Dunham*, 11 Gray, 42; *Williams* v. *Williams*, 55 Wis. 300).

It is said, that White's books showed the purchase of these stocks with trust funds, and that he reported the same to the heirs; and that, therefore, he would be precluded from claiming them as his individual property. This would undoubtedly be true if the beneficiaries were claiming, that they, and not he, were the owners of the stocks; but it is optional with the beneficiaries either to

take the stocks, or to call for the amount originally invested therein, unless they are estopped by acquiescence or ratification.

*Third*—It is, however, claimed by plaintiff in error, that the complainants herein are estopped from questioning the investments, made by White in these railroad securities, upon the alleged ground, that they had knowledge of such investments and acquiesced in them. Such acquiescence and knowledge are sought to be established by the testimony of the stenographer, who had been in the service of White in his lifetime, and by the contents of certain reports, relating to his management of the trust, which he submitted to the beneficiaries therein semi-annually. It is not, nor can it be, claimed, that any of this testimony in regard to acquiescence is binding upon the trustee, Reed, or his predecessor, the trustee, Swan, who were appointed long after the death of White.

Even though a trustee may have acted with the best intention, yet if the trust estate has been wasted by his own breach of trust, there can be no question as to his liability, unless the beneficiary sanctions, or acquiesces in, the wrong with full knowledge of the facts, or of his rights in the premises. In order to bind a *cestui que trust* by acquiescence in a breach of trust by the trustee, it must appear that the *cestui que trust* knew all the facts, and was apprised of his legal rights, and was under no disability to assert them. Such proof must be full and satisfactory. The *cestui que trust* must be shown, in such case, to have acted freely, deliberately and advisedly, with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which it is material for him to know. He cannot be held to have recognized the validity of a particular investment, unless the question as

to such validity appears to have come before him. The trustee setting up the acquiescence of the *cestui que trust* must prove such acquiescence. The trustee must also see to it, that all the *cestuis que trust* concur, in order to protect him from a breach of trust. If any of the beneficiaries are not *sui juris*, they will not be bound by acts charged against them as acts of acquiescence. The trustee cannot escape the liability merely by informing the *cestuis que trust,* that he has committed a breach of trust. The trustee is bound to know what his own duty is, and cannot throw upon the *cestuis que trust* the obligation of telling him what such duty is. Mere knowledge and non-interference by the *cestui que trust* before his interest has come into possession do not always bind him as acquiescing in the breach of trust. As a general rule, acquiescence by a tenant for life, or by a *cestui que trust* for life, will not bind the person entitled to the remainder. (*Zimmerman* v. *Fraley,* 70 Md. 561; Kerr on Fraud, (Bump's ed.) pp. 297, 299, 300, 301, 312; 2 Pomeroy's Eq. Jur. 1083, note; Perry on Trusts, secs. 285, 467; *Life Ass.* v. *Siddall,* 3 D., F. & J. 58). Imperfect information will be regarded as equivalent to concealment; and a person is not estopped by his silence when there is no positive duty or opportunity to speak; nor will mere delay short of the period, fixed as a bar by the Statute of Limitations, preclude the assertion of his equitable rights. (*Phillipson* v. *Gatty,* 7 Hare, 516; Bispham's Hill on Trustees, 526; 7 Am. & Eng. Ency. of Law, 13, note, and cases cited; 1 Perry on Trusts, sec. 467; *Gibbons* v. *Hoag,* 95 Ill. 45; *Henry County* v. *Drainage Co.* 52 id. 454).

Some testimony was introduced, tending to show that early in the year 1887 White called some of the beneficiaries in the trust to his office, and brought up the question as to how the rents should be temporarily invested before the arrival of the period for their application upon the mortgage. At this interview all the beneficiaries were not present. Three of them were absent; two

of them at that time were under age.   Only two, to-wit:
the two children of the testator, were entitled to any
portion of the income from the rents.   The grandchildren
of the testator were mere remainder-men.   We do not
deem it necessary to enter into a discussion of the ques-
tion whether the remainder was a vested or a contingent
remainder.   It is said, that White then made some state-
ment about the difficulty of lending the money for short
periods by making real estate loans, or call loans; and
suggested something about buying railroad stocks.   The
testimony upon this subject is that of one witness, who
was a stenographer of White; it is not clear as to the ex-
tent, to which he communicated with the beneficiaries
upon the subject of investing in railroad securities; but
it is clear that he was told by one of the beneficiaries
present *to use his own judgment* in regard to the matter.
This statement by one seems to have been concurred in
by all the others who were present.   He was not thus
authorized by them to invest in railroad securities.   They
did not choose, and were not bound, to exercise any judg-
ment upon the subject.   He had control of the estate;
and the matter of investment was entirely within his own
discretion, subject to the rules of law.   In saying to him,
that he should use his own judgment, they merely said
to him what the law had already said to him.   They re-
fused to take any responsibility in the matter.   We can
not see, that there was anything in the interview in 1887
upon this subject, which amounted to any authorization
to him to invest the funds of the estate in railroad stocks.

The stenographer, who testified to this interview, says
that White took the stocks in his own name, so as not to
be obliged to apply to the court, in case he should desire
to sell them.   The reason, given for not wishing to make
such application to the court, was that it might be neces-
sary to dispose of the stocks quickly, and an application
to the court would create delay.   We do not regard this
reason for taking securities in his own name as sufficient.

He was a trustee appointed by the court in accordance with the provisions of the will, and it was his duty to call for the direction of the court when necessary, and to act under the orders of the court when necessary. It was not, therefore, proper for him to put himself in such a position, as would relieve him from the necessity of asking the direction of the court.

As to the reports, which White made to the heirs semi-annually, we concur with the Appellate Court, which says in its opinion in regard to these reports: "That the reports were misleading, must be apparent to any one who, without other information, should examine them." These reports concealed the fact, that the securities had been taken in White's name; and also concealed the fact, that the securities were steadily declining in value all the time.

The Appellate Court further says: "In his report of July 1, 1888, which was the report next following the purchase of the first one hundred shares of the Rock Island stock, it was made to appear that he had bought for the estate some stock in that company—but without specifying how many shares—to the amount of $11,300.00, and had received a dividend thereon. In his report of January 1, 1889, which was the one next following the purchase of the one hundred shares in the Missouri Pacific company, and another like number of shares in the Rock Island company, he made no mention of having purchased these stocks, but, presumably in order to account for the money paid for them, his report stated as follows: 'Pd. Winchester & Co., acc't loan, voucher No. 249, $18,150.00.' In that same report under the heading of investments and assets, he stated: 'To cash invested in railroad securities, $29,450.00.' This amount of $29,450.00 was the aggregate of his stock purchases as already stated, and it is carried along in all subsequent reports down to and including July 1, 1890, under the heading of investments, as 'Cash invested in railroad securities.'

From this date it is successively called: 'Cash invested in railroad stock,' and 'invested in stocks,' until in the last report of January 1, 1894, it is denominated under the heading of 'resources,' as 'Sundry railroad stocks (cost) $29,450.00.' Wherever in the reports there occurs a statement of receipts from the railroad companies, it is usually as interest, but is sometimes mentioned as dividends. In none of the reports is it stated, except inferentially, that any Missouri Pacific stock had ever been bought for the estate or was held by it, and in but one report, that of July 1, 1892, was it ever stated how many shares of stock in either company was owned by the estate. * * * With reference to the $18,150.00, now known to have been invested in Missouri Pacific and the second lot of Rock Island shares, and the certificates of which were taken in White's individual name, there seems never to have been any full disclosure thereof made by White. The report, which accounted for the money they cost, showed on its face a loan of that sum. It would seem to be hardly susceptible of any other reading by a person of ordinary understanding, and that it would be so interpreted by an expert book-keeper, is shown by the testimony of the expert who examined the reports in connection with White's books of account, and testified that the report showed a loan instead of a purchase, and that White's books showed the same, although it was otherwise conclusively proved that no such loan was ever made. We are unable to comprehend how the furnishing of such information can be regarded as coming within the rule, that demands full information of all that is material to be given to one against whom estoppel by confirmation and acquiescence is invoked." We fully approve of the views thus expressed by the Appellate Court in their opinion in reference to the reports in question.

There is absolutely nothing in this record to show, that, when fully informed of these investments in railroad securities, the parties in interest did not object to

the same and disapprove of the same. They are incompetent witnesses, and could not testify in this case. As to the report of July 1, 1892, upon which so much stress is laid, that report merely states what the trustee had already done; it does not ask the beneficiaries to advise him what he shall do. The fact, that he stated to them what he had done, is not evidence that they approved of what he had done. The remainder-men cannot be estopped by the receipt of dividends upon the stocks, because no such dividends were ever paid to them. Nor is it apparent that such dividends entered into the sums of $3000.00 per year, which were paid to the life tenants. So far as it is shown to the contrary, such dividends may have been applied with other money in payment of the mortgage. Consequently, we do not think that any acquiescence can be inferred from the receipt by the parties interested of dividends on the stock.

The evidence does not show, that the question of the liability of the trustee for these investments was ever raised as between the trustee and the beneficiaries. (Kerr on Fraud,—Bump's ed.—301, and cases cited). The only positive testimony in this case is that showing the breach of trust. The testimony introduced to show ratification or acquiescence in such breach is in the nature of inference only. Upon the whole our conclusion is, that the act of the trustee in investing the funds of the estate in these speculative securities cannot be justified on the ground of acquiescence or ratification on the part of the parties interested.

*Fourth*—It is objected that plaintiff in error has been charged with compound interest. We think that she is chargeable with interest at legal rates with annual rests, on the sums invested by said White in said stocks, from the dates of the investments, less deductions for all dividends received with like interest. This rule, adopted by the Appellate Court, does justice to the parties, and is in accordance with the settled policy of equity. (*Hough*

v. *Harvey,* 71 Ill. 72; *Hughes* v. *People,* 111 id. 457; *Lehman* v. *Rothbarth,* 159 id. 270).

*Fifth*—The plaintiff in error was liable for the ·full amount of the commissions, shown to have been received by her husband on insurance premiums paid by him out of the trust funds. He joined a certain underwriters' association for the purpose of getting a commission upon such premiums. He was paid a commission of seven and one-half per cent on the premiums paid by him for insurance on the Sherman House, and concealed that fact from the beneficiaries. The law does not allow a trustee to retain any personal gain, which he may obtain in such a manner as subjects him to the temptation of placing himself in a position which may be hostile to the interests of the estate, whether the estate is actually injured or not as a matter of fact. The fact, that he was receiving commissions, might have subjected him to a temptation to place a larger line of insurance than was necessary on the trust property. It is not essential, that the estate has suffered a loss from what he has done; it is sufficient that he has gained a profit. Whether the contract was beneficial or injurious to the estate is wholly·immaterial. An agent is only entitled to commissions upon a faithful performance of all the duties of his agency. One of these duties is to render to his principal statements of all money received and profits made through his agency. (*Fish* v. *Seeberger,* 154 Ill. 30; *Hoyt* v. *Shipherd,* 70 id. 309; 27 Am. & Eng. Ency. of Law, 187, 194, 196; Perry on Trusts, sec. 209; *Gillette* v. *Peppercorne,* 3 Beav. 78; 2 Pomeroy's Eq. Jur. sec. 1075).

It was proper to deduct from the commissions received by White the fees, which he paid to the underwriters' association in order to maintain his membership therein. The law only charges him with the profits which he made out of the trust estate. These profits consisted of the commissions less what he paid for membership fees.

*Sixth*—It is said on behalf of plaintiff in error, that the appellees herein are estopped by reason of a finding made in the decree entered on April 24, 1894. That decree finds among other things, that White "faithfully discharged his duties as such trustee of said estate until the 24th of March, 1894, when he departed this life." The point is made, that the validity of White's acts in investing in the railroad securities cannot be questioned in this present suit, because he was found by such decree to have faithfully discharged his duties. The finding in question is merely in the reciting part of the decree, and is not part of the final order therein. The decree in question was entered by consent. The object of the bill, filed on April 23, 1894, was to obtain the appointment of a trustee in the place of White who had died. Swan was finally appointed as successor in trust; but Swan or Reed, the main complainant in this suit, was not a party to the suit begun on April 23, 1894. It is true, that the decree of April 24, 1894, appointed Swan successor in trust. But the latter decree did not involve the question as to the liability of White's estate to account for the money invested in the railroad securities. Such liability was not a question in issue in the suit in which the decree was rendered. Former adjudication, to constitute a bar, must have been on what was actually in issue, and the determination of which was essential to the judgment. (6 Am. & Eng. Ency. of Law, 794, note 4; 21 id. 233; *Riverside Co.* v. *Townshend,* 120 Ill. 9). We are of the opinion, that the mere preliminary recital in the decree of April 24, 1894, that White had faithfully discharged his duties as trustee, does not preclude the complainants in the present suit from questioning the validity of the investments here under consideration.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*