Merchants National Bank of Aurora, Appellant, v.
Walter S. Frazier et al., Appellees.

Gen. No. 10,068.

Opinion filed June 14, 1946. Released for publication July 15, 1946.

NEWHALL & GIVLER, of Aurora, for appellant.

GARIEPY & GARIEPY, of Chicago, for appellees; J. EMIL BRUNNEMEYER, of Aurora, *guardian ad litem;* FRED A. GARIEPY and JOHN SPALDING, both of Chicago, and J. EMIL BRUNNEMEYER, of Aurora, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

On July 14, 1941, Merchants National Bank of Aurora, appellant, filed a complaint in the circuit court of Kane county against appellees, and Walter S. Frazier, since deceased, alleging that it held as escrow agent, under a written escrow agreement, certain described securities and cash belonging to appellees, which they refused to accept, and asking an order directing appellant to deliver the securities and cash to appellees, or to some person for them to be designated by the court, and decreeing that the plaintiff had fully complied with all the terms of the escrow agreement, and that it be relieved from any further responsibility or liability thereunder. The defendants answered the complaint and filed a counterclaim, alleging the creation of a trust under the escrow agreement and the assumption by the bank of trust duties and a fiduciary relationship as to the investment of

$18,000 of the funds received by it. The counterclaim charged mismanagement of the trust fund with a consequent loss to the trust estate, and sought relief. Issues were joined, the cause was referred to the master, objections to his report, standing as exceptions, were overruled, and a decree was entered dismissing the complaint for want of equity, and ordering appellant to pay appellees the sum of $21,447.87 and costs of suit, and to pay the *guardian ad litem* for the two minor defendants a fee of $1,116 to be taxed as costs. The cause is here on the bank's appeal from the decree.

The record shows that on March 29, 1924, a written contract for the sale of certain premises in the City of Aurora was executed by Walter S. Frazier, Philip Frazier, Helen F. Heinley, their respective spouses, and Anna Frazier, unmarried, as vendors, George B. Kingsley as vendee, and appellant bank as escrow agent. The purchase price of the property was $80,000, payable to the escrow agent, with an initial payment of $10,000, the balance due in instalments, the final payment of $40,000 due April 1, 1934, with privilege of prepayment. All payments thereunder, up to the final $40,000 payment were to be distributed by appellant, less its reasonable charges, one half to Walter S. Frazier, and one fourth each to Philip Frazier and Helen P. Heinley. By the terms of the will of Anna Frazier's father, the premises were charged with the payment to her of $700 per annum during her lifetime. This was released to the vendee by the contract, with a provision for restoration thereof in case of his default. This contract contained the following provision:

"When and if the said final forty thousand dollars ($40,000.00) payment shall be made by Vendee the Escrow Agent is directed to segregate, retain and invest such portion thereof as will produce a net income of seven hundred dollars ($700.00) annually, which

sum shall be paid to Anna Frazier during her life. At her death the principal sum so directed to be retained shall be distributed by the Escrow Agent less its reasonable charges, one-half to Walter S. Frazier and one-quarter each to Philip Frazier and Helen F. Heinley as above."

On June 29, 1928, appellant wrote each of the vendors that the vendee would pay the balance of the purchase price on July 6, 1928 and would expect delivery of his deed, stating that "Under the terms of the escrow agreement, we will be required to retain out of the money which Mr. Kingsley pays to us an amount sufficient to insure an annual income of $700.00 to Miss Anna Frazier for the term of her lifetime. The remainder of the funds will be distributable as soon as received." The letter also stated that the bank had undertaken to underwrite a 6 per cent first mortgage on the property for $70,000 upon delivery of the deed, and suggested investment in the notes by the vendors from their shares of the funds; and also suggested that the bank held other mortgages and securities which it would be very pleased to have an opportunity to submit for their consideration.

Under date of July 2, 1928, appellant made the $70,000 loan to Mr. Kingsley, secured by a trust deed on the property, in which the bank was named as trustee. About $51,000 had been spent on the property in repairs and improvements, and the total income was about $1,000 per month. On July 6, 1928, the vendee paid appellant the balance of the unpaid purchase price, $63,000, with accrued interest from April 1, aggregating $63,994.19, and received his deed. Of this amount appellant retained $18,000, shown on its statement of distribution on July 7, 1920 to each of the vendors as: "Withheld by Merchants National Bank, Trustee for Anna Frazier, $18,000." Appellant also retained $50 "as escrow agent April 1 to July 6, and closing fee," and distributed the balance of the

funds in accordance with the terms of the contract. The statement of distribution was accompanied by a letter advising the vendors that appellant had retained $18,000 as the annuity fund; that it was their custom under a trust calling for a definite annual income to hold such an amount as would produce such income at 4 per cent; that at the "present" time the fund would net approximately 5½ per cent; and that at the end of each year the surplus income over the $700 requirement would be distributed to them, and that upon the death of Anna Frazier the entire fund as then constituted would be paid out to them.

On the same day, appellant opened an account in its trust department, under the heading: "Trust No. 154. Anna Frazier Trust Under Agreement." The first entry in the account reads: "July 7, 1928—Rec'd. from M. N. Bank Escrow Agent initial principal $18,466.68." The $466.68 was money the bank had on hand to the credit of Anna Frazier from principal payments into the escrow. On the same day the account was debited with $8,006.58 on account of appellant's purchase from itself of $8,000 face value and accrued interest of the Kingsley notes. This and other investments by appellant from the fund will be discussed later.

From July 7, 1928 to May 20, 1942, appellant rendered the vendors annual statements of the receipts, disbursements, and investments from the fund. Each of the statements was captioned either as "Statement of the Merchants National Bank of Aurora, as Trustees for Anna Frazier," or "Annual Statement of Merchants National Bank of Aurora as Trustee Under Agreement for Anna Frazier." After appellant was called on by appellees to account, it issued its statement for the period ending May 20, 1942, omitting any reference to the trust, and merely referring to the "Anna Frazier account." None of the statements, except that of July 27, 1929, disclosed

from whom the bank purchased securities for the account. The vendors took no action respecting any of these statements. The $700 per annum was paid to Anna Frazier by appellant during her lifetime, and she died on August 7, 1936. Helen F. Heinley died in December 1939, leaving her husband and two minor children surviving, and they were made parties defendant to the complaint. Walter S. Frazier died during the pendency of the suit and on December 8, 1944 the administrator with the will annexed of his estate was substituted as a defendant and counterclaimant.

The record shows that with the exception of the Kingsley notes purchased by appellant from itself, all the securities with which the decree surcharges appellant, purchased by it from the $18,000 fund, were purchased from the bank's affiliate, the Merchants National Investment Company, a corporation organized in 1931 to take over the investment and loan business of the bank. Seven of the bank's directors were subscribers to the capital stock of the investment company, in substantial amounts. Five of its directors were directors of the bank, and its office adjoined the trust department of the bank on the second floor of the bank building. Some of its stockholders were stockholders in the bank, and the trust officer of the bank was president of the investment company. In 1933, the investment company moved to other quarters in the city, and later to the Kingsley building. In 1937 its corporate name was changed to ''Aurora Investment Company,'' under which name it was still doing business at the time of the trial. All of the surcharged securities had largely declined in value.

The basis of the decree is as follows: Principal amount of improper investments, $19,728.06, interest thereon at 5 per cent from date of the decree, $8,525.32, aggregating $19,253.38, less $2,482.50 interest thereon, received and distributed, leaving a net balance of $16,770.88. To this was added $3,053.49, cash in ap-

pellant's hands on May 20, 1942, and the principal of the Felz note of $1,390 collected by appellant during the course of the litigation and not surcharged, making a total of $21,214.37, to which was added stenographer's and master's charges of $227.50, making a grand total of $21,441.87, the amount of the decree.

Appellant claims that the written agreement created merely a special agency; and that there was no trustee beneficiary relationship; that upon receipt by the vendors of the letter from appellant stating that it had retained $18,000 for the purpose of investment in securities, the vendors had the right as principals under the agreement, to direct, first, how much should be retained by appellant, as, in any event, the bank was only acting as their agent and subject to their control; second, what particular class of securities they desired the bank to invest in; that if Government bonds were desired by the principals, at least $25,000 would have to be retained, instead of the $18,000, "proposed" by the bank; third, to inquire of the bank what they had or proposed to invest in to produce a net income of 5½ per cent; and that appellees are precluded from objecting to appellant's accounts because of failure to raise objections at the time of appellant's annual statements.

Appellees contend that the written agreement created a trust which became operative when the escrow was terminated and appellant withheld from the proceeds of the escrow an amount which it deemed adequate to produce the annual income of $700 for Anna Frazier; that appellant was a fiduciary, and violated the law and the trust by purchasing securities from itself and from its affiliate for the trust estate; and that appellees did not waive such breaches of trust and are not estopped from holding appellant liable for its misconduct. The decree finds that appellant was and is such a trustee, and this is the principal issue.

The contract does not contain, either directly, or by necessary implication, any such rights on the part of the vendors as is claimed by appellant. By its terms, the bank was required to retain an amount sufficient to produce an annual income of $700, and the bank .alone had power to determine the amount to be so retained. No right was given to or reserved by the vendors to designate the amount to be retained for investment, or to say in what class of securities such investment should be made, but the duty and the responsibility in those matters were wholly those of the bank.

An escrow has been defined to be a written instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promissor or obligor, or his agent, with a stranger or third party, to be kept by the depository until the performance of a condition or the happening of· a certain event and then to be delivered over to the grantee, promisee or obligee. (*Main v. Pratt,* 276 Ill. 218, 224.) In *Stark v. Chicago Title & Trust Co.,* 316 Ill. App. 353, 360, the court said in the opinion: "From the time the deposit is made the escrowee becomes the trustee of both the party making the deposit and the one for whose benefit it is made." However, if it be conceded that appellant was merely an escrow agent up to the time final payment was made by the vendee and the deed was delivered to him, it is obvious that upon the occurrence of those events, the escrow agreement was fully performed and terminated as between the vendors and the vendee, and as between appellant and the vendee, and when the money received by appellant, over and above the $18,000, was distributed to the vendors the next day, the escrow as to the fund so distributed was also fully performed and terminated, which leaves in question only the status of the $18,000 retained, and with which the vendee never had any-

thing to do. From that time on, the contract was effective between appellant and the vendors exclusively.

The opinion in *Weer v. Gand*, 88 Ill. 490, 493, quotes Story on Equity Jurisprudence, sec. 964, as follows: "A trust, in the most enlarged sense used in English jurisprudence, may be defined to be an equitable right, title or interest in property, real or personal, distinct from the legal ownership thereof; in other words, the legal owner holds the direct and absolute dominion over the property, in view of the law; but the income, profits or benefits thereof in his hands belong wholly or in part to others." The opinion further quotes the following from Lord Hardwicke's expression in *Stuart v. Mellish*, 2 Atk. 612: "A trust is where there is such confidence between parties that no action at law will lie, but is merely a case for the consideration of this court." In *Wagner v. Maynard*, 64 Ill. App. 239, the same doctrine is laid down as in *Stuart v. Mellish, supra*. See also *Pure Oil Co. v. Byrnes*, 388 Ill. 26, 40. Generally, a trust may be said to exist where the legal estate is in one person and the equitable estate is in another, or where there are rights, titles and interest in property distinct from the legal ownership thereof. (*Martin v. Rockford Trust Co.*, 281 Ill. App. 441.) Manifestly, when appellant segregated and took over the $18,000 for investment, it had the legal title thereto, and the beneficiaries of the fund had only the equitable title.

The basic difference between a trust and an agency is stated in 1 Scott on Trusts, par. 8, as follows: "An agent acts for and in behalf of his principal and subject to his control; a trustee as such is not subject to the control of his beneficiary, although he is under a duty to deal with the trust property for his benefit in accordance with the terms of the trust and can be compelled by the beneficiary to perform his duty. The agent owes a duty of obedience to his principal; a trustee is under the duty to conform to the

terms of the trust. An agent as such does not have title to the property of the principal, although he may be entrusted with possession and although he may have power to pass title; a trustee has title to the trust fund. The incidents of the agency relation are often different from those of a trust. An agent acting within the scope of the employment has power to subject his principal to liability in contract and in tort; the trustee, unless he is also an agent, has no such power. Liabilities which are imposed by law upon the owners of property are imposed upon the principal and not upon the agent; such liabilities, however, are imposed upon the trustee and not upon the beneficiary." The essential distinctions between a trust and an agency are that the title and control of the property is in the trustee, who acts in his own name, while an agent represents and acts for his principal and a trust may ordinarily be terminated by the fulfillment of its purpose, while an agency may in general be revoked at any time. (See *Light v. Scott*, 88 Ill. 239.)

It is essential to the creation of a trust that the declaration must make reasonably certain its material terms, and that these terms include, first, the subject matter or property embraced within the trust; second, the beneficiaries or persons in whose behalf the trust is created; third, the nature and quantity of the interests which they are to have; and fourth, the manner in which the trust is to be performed. (*Marble v. Estate of Marble,* 304 Ill. 229, 235; *People ex rel. Nelson v. Chicago Bank of Commerce,* 371 Ill. 396.) A trust has been defined as an obligation upon a person arising out of confidence reposed in him to apply property faithfully and according to such confidence. It is also said to be in the nature of a deposition, by which a proprietor transfers to another the property of the subject intrusted, not that it should remain with him, but that it should be applied to certain uses for

the behoof of a third person. There is no particular
formality required or necessary in the creation of a
trust. Any agreement or contract in writing made by
a person having the power of disposal over property,
whereby such person agrees or directs that a particu-
lar parcel of property or a certain fund shall be held
or dealt with in a particular manner for the benefit of
another, in a court of equity raises a trust in favor
of such other person claiming under him, voluntarily
or with notice. (*Marble v. Estate of Marble, supra,* at
page 240, citing Perry on Trusts, secs. 2 and 82;
*Kemmerer v. Kemmerer,* 233 Ill. 327, 333, 334.) In the
*Marble* case it is also held that the relation of debtor
and creditor may be changed to that of trustee and
*cestui que trust,* but that in order to effect the change
there must be some particular property or certain fund
held for the benefit of the *cestui que trust,* and that it
is essential that the declaration must not only show an
intention on the part of the debtor to become a trustee,
but it should also show the existence of a fund in his
hands or property in his possession which he holds for
the benefit of the creditor. This, in principle, is in ac-
cord with the contention of appellees that even if ap-
pellant was only initially an escrow agent, the relation
as such escrow agent was changed to that of trustee
when appellant segregated and retained the specific
amount of $18,000 for investment, after all the other
provisions of the contract were performed and
terminated. Thus, merely labeling appellant in the
contract as escrow agent respecting the fund to be re-
tained and invested, or as a trustee, by the entries on
its books and in its annual statements, is not deter-
minative of the real character of the transaction, but
its true status must be determined from the relations
of the parties, their respective rights and duties, as
disclosed by the record, and the law applicable
thereto. Under the facts in this case, and the prin-
ciples announced by the foregoing authorities, the

trial court was correct in holding that appellant was and is a trustee of the $18,000 fund.

The remaining question is whether appellant's investments from the fund comport with its duties and obligations as such trustee. The securities surcharged by the decree as improper investments, are as follows: (1) Four Kingsley notes, purchased by appellant from itself, of which three were for $1,000 each, and the fourth for $5,000, numbered 95, 96, 97 and 110, out of 110 notes maturing serially up to July 2, 1938. The decree finds that the makers defaulted in the payment of interest on January 2, 1933, and foreclosure was instituted on November 9, 1934. As a result, appellant received a certificate of a fractional beneficial interest, stated by the decree to be in the amount of $9,120. The other securities, all purchased by appellant from the investment company are: (2) The H. F. Heiss notes, one for $100 and one for $1,000 face, and accrued interest, $1,115.32, purchased in July 1932, on which interest was in default since May 1, 1931, and subsequently exchanged for a certificate of beneficial interest. (3) The Frank J. Burkel note of $1,000 and accrued interest, purchased July 19, 1932, out of a $21,000 loan made by the investment company. The first interest, due December 30, 1932, was defaulted, and on Febuary 1, 1938, the note was exchanged for a certificate of beneficial interest issued by the investment company, and payment of $210.49 was subsequently made, leaving a principal balance unpaid of $789.51. (4) The Roscoe Sprinkel note, No. 5 for $500 face and accrued interest of $1.35, purchased April 15, 1932, maturing April 1, 1936, out of a $11,500 loan maturing serially, secured by a trust deed in which appellant was named trustee, the last notes due April 1, 1937. The interest due April 1, 1933, was defaulted, later paid in six instalments in 1934, and the maturity of the loan was extended to April 1, 1943. (5) The N. F. Tillitson note for $100 and accrued in-

terest of 43 cents, being No. 7 of nine notes for $3,500, all maturing June 17, 1936, purchased on July 11, 1932, on which the interest of $113.75 due June 17, 1932, was in default, and so remained until January 5, 1933, when $35 of it was paid.

None of these notes conformed to the requirements of the statute then in force (Ill. Rev. Stat. 1943, ch. 148, par. 32 [Jones Ill. Stats. Ann. 135.05]), enumerating the securities permissible for the investment of trust funds. The Kingsley notes, the Sprinkel note, and the Heiss notes were ''split'' securities of the class condemned in *In re Estate of Lalla,* 362 Ill. 621, 627, as not being first mortgage notes because there was no parity clause, and other notes of the issue had prior maturities and were entitled to priority in the order of their maturity. The interest on the Heiss notes and the Tillitson note was in default when the notes were purchased, and by the statute only such notes on which there had been no default in the payment of interest for five years were permissible investments.

Furthermore, a fatal objection to the validity of the surcharged investments is the purchase of such securities by appellant from itself or from its affiliate, the Merchants National Investment Company. The principles upon which that doctrine is based are so familiar as to need no repetition here, and are found fully set out in *Kinney v. Lindgren,* 373 Ill. 415, 422; 2 Scott, Law of Trusts, sec. 170.12, pp. 875–877; Restatement of Trusts, par. 170, p. 435; *Bennett v. Weber,* 323 Ill. 283, 293, 294; *Campbell v. Albers,* 313 Ill. App. 152, 166; *Joliet Trust & Savings Bank v. Ingalls,* 276 Ill. App. 445, 451; *Lawndale Nat. Bank of Chicago v. Kaspar American State Bank,* 288 Ill. App. 555, 558.

Appellant argues that if the bank had not made the Kingsley loan in 1928, there would undoubtedly have been a 1931 default in payment under the contract, and the vendors would have been compelled to repossess the building at a shrinkage of at least

$25,000. Appellant admits that this is no legal reason or defense, but urges that it is an element to be considered because, during the depression days of 1930 and 1931, there was a loss in all classes of securities except Government bonds, and suggests that evidently the Fraziers did not wish the fund to be invested in Government bonds because it would require a larger amount than the $18,000 in order to yield an annual income of $700. The answer to these contentions is that the financial depression of that period is not an excuse for imprudent investments by a trustee (*In re Estate of Busby,* 288 Ill. App. 500, 519), and the vendors had no right to a voice in the selection of securities for investment, as hereinabove pointed out.

Appellant's contention that because appellees were informed of the investments by the annual statements and made no objection thereto, they are estopped to now question them, is without merit. Appellant was a trustee. None of the statements disclosed that any of the securities were purchased by appellant from its affiliate, or that any of them were "split" securities of the class mentioned above, or were in default when purchased, and there is no claim or showing that any of appellees had knowledge of any of such conditions. In order to bind a *cestui que trust* by acquiescence in a breach of trust by the trustee, it must appear that the *cestui que trust* knew all the facts, and was apprised of his legal rights, and was under no disability to assert them. Such proof must be full and satisfactory. The *cestui que trust* must be shown, in such case, to have acted freely, deliberately and advisedly, with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which it is material for him to know. He cannot be

held to have recognized the validity of a particular investment, unless the. question as to such validity appears to have come before him. The trustee cannot escape the liability merely by informing the *cestui que trust,* that he has committed a breach of trust. The trustee is bound to know what his own duty is, and cannot cast upon the *cestui que trust* the obligation of telling him what such duty is. Moreover, mere knowledge and non-interference by a *cestui que trust* before his interest has come into possession do not always bind him as acquiescing in the breach of trust. As a general rule, acquiescence by a tenant for life, or by a *cestui que trust,* for life, will not bind the person entitled to the remainder. (*White v. Sherman,* 168 Ill. 589, 605 *et seq.,* citing numerous authorities.) Imperfect information will be regarded as equivalent to concealment; and a person is not estopped by his silence when there is no positive duty or opportunity to speak; nor will mere delay short of the period, fixed as a bar by the Statute of Limitations, preclude the assertion of his equitable rights. (*White v. Sherman, supra.*) The same principles are laid down in *Penn v. Fogler,* 182 Ill. 76, 109; *In re Estate of Busby,* 288 Ill. App. 500, 538; *Fidelity & Casualty Co. of New York v. Heitman Trust Co.,* 317 Ill. App. 256; *Joliet Trust & Savings Bank v. Ingalls, supra; In re Cook's Trust Estate,* 20 Del. Ch. 123, 171 Atl. 730. In *State v. Illinois Cent. R. Co.,* 246 Ill. 188, relied upon by appellant, where a contract relation of debtor and creditor existed as to periodical payments to the State of 5 per cent of the railroad company's gross revenues, the court pointed out in the opinion (page 240), that although the relations between the parties were similar in some respects to a fiduciary relation, no such fiduciary relation, in the strict use of that phrase, existed. There is nothing said in the opinion which is out of harmony with the authorities above cited. Other cases relied upon by appellant, involving the

relation of principal and agent, are not in point.

The fact, urged by appellant, that Walter S. Frazier bought $2,000 of the Kingsley notes, a few weeks after the trust deed was made, does not show such acquiescence in appellant's improper purchase of the Kingsley notes as to estop him or his legal representative from complaining about the investment. He bought the notes upon appellant's suggestion, without a disclosure to him that they were improper "split" securities, and upon the express representation by appellant to him in a letter that they were "direct first mortgage" notes.

 The improper investments mentioned were properly charged to appellant, and the amount of the decree, $21,447.87, is correct. However, the trial court fell into error in taxing the *guardian ad litem's* fee to appellant. Under section 6 of the Chancery Act (Ill. Rev. Stat. 1945, ch. 22, par. 6 [Jones Ill. Stats. Ann. 106.03]), it should have been taxed against the estate. (*Hutchinson v. Hutchinson*, 152 Ill. 347, 353; *Wilbur v. Wilbur*, 138 Ill. 446, 452; *Wright v. Upson*, 303 Ill. 120, 145; *People v. Pasfield*, 284 Ill. 450, 458.) In *Flynn v. Flynn*, 283 Ill. 206, relied upon by appellees, the proceeding was not a chancery matter, but was a statutory appeal from an order admitting a will to probate, and hence is not applicable. *Hall v. Woods*, 325 Ill. 114, 141, also relied upon by appellees, was an injunction proceeding against certain persons to prevent them from acting as officers of the Addressograph Company, a corporation. The defendants and others filed a cross bill against the complainants and others, including the Addressograph Company. A *guardian ad litem's* fee was taxed against the Addressograph Company, and it was contended that it should have been taxed against the complainants in the original bill. The court held that taxing it against the Addressograph Company amounted practically to a division of it between the parties and was proper. In

*Allis-Chalmers Mfg. Co. v. Hayes,* 339 Ill. 230, 239, a partition suit, also relied upon by appellees, the decree dismissed the bill for want of equity and taxed the *guardian ad litem's* fee as a part of the costs. The decree was reversed on the merits and the cause was remanded with directions to enter a decree for partition, and it was held that in view of the fact that the decree must be reversed, the fee of the *guardian ad litem* and the costs of the appeal should be taxed against the appellees. Neither of the two last mentioned cases upholds the contention of appellees in this case, that the *guardian ad litem's* fee was properly taxed to appellant.

On account of the error in taxing the *guardian ad litem's* fee against appellant, the decree is reversed in that particular, but in all other respects it is affirmed. The cause is remanded to the circuit court with directions to modify the decree conforming it to the views herein expressed.

*Reversed in part and remanded with directions.*