Docket Nos. 96012, 96114 cons.–Agenda 15–November 2003.

BRIAN MATTIS, Indiv. and on Behalf of All Others Similarly Situated, Appellee and Cross-Appellant, v. THE STATE UNIVERSITIES RETIREMENT SYSTEM 
et al.
, Appellants and Cross-Appellees.

Opinion Filed May 20, 2004.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

On February 16, 1995, appellee Brian Mattis, a retired law professor, brought suit in the circuit court of Champaign County against the State Universities Retirement System (SURS) and the members of the SURS executive committee: William Norwood, Emil Haeflinger and Stanley Rives. Count I of Mattis’ complaint sought administrative review of the executive committee’s denial of Mattis’ administrative claim against SURS. In this claim, Mattis had argued that, following his retirement from his position as a law professor at Southern Illinois University (SIU) in 1994, SURS calculated his retirement annuity based on an incorrect interpretation of certain provisions of article 15 of the Illinois Pension Code (40 ILCS 5/15–101 
et seq. 
(West 1992)). According to Mattis, because of SURS’s misconstruction of the statute, his retirement benefits were considerably lower than they should have been. Mattis asked SURS to rectify the situation, but SURS declined, maintaining that its interpretation of the statute was correct.

The remaining counts of Mattis’ complaint were based on this same alleged misinterpretation of the statute. In these counts, Mattis sought common law and civil rights relief not only on his own behalf but also on behalf of a purported class of similarly situated individuals.

The circuit court dismissed all counts in Mattis’ complaint other than the administrative review claim (count I). Subsequently, the court granted summary judgment in favor of defendants on count I, finding that SURS’s administrative “decision is not against the manifest weight of the evidence and is not contrary to law.” Mattis appealed, and the appellate court reversed, holding that SURS misconstrued the statute. 
Mattis v. State Universities Retirement System
, 296 Ill. App. 3d 675 (1998). In addition to reversing the circuit court’s judgment on count I, the appellate court also reversed the dismissal of four other counts in Mattis’ complaint. Following remand to the circuit court, the relevant provisions of the Pension Code were amended by the legislature. These amendments, which took effect on July 6, 2000, supported SURS’s interpretation of the statute. The circuit court declared the amendments unconstitutional, and remanded to SURS “for a recalculation of plaintiff’s pension benefits consistent with the language of the 
Mattis
 Appellate Court opinion.” The circuit court ultimately ruled in favor of Mattis on his administrative claim against SURS. The court also awarded Mattis attorney fees and expenses. However, the remaining counts in Mattis’ third amended complaint were dismissed.

Given the circuit court’s invalidation of the Pension Code amendments, defendants appealed directly to this court. 134 Ill. 2d R. 302(a). Defendants’ appeal was docketed in this court as cause No. 96012. Mattis appealed to the appellate court. Upon motion by defendants, Mattis’ appeal was transferred to this court and consolidated with defendants’ appeal. Mattis’ appeal was docketed as cause No. 96114.

BACKGROUND

On June 17, 1993, Mattis elected to retire from SIU under the early retirement provisions of section 15–136.2 of the Pension Code (40 ILCS 5/15–136.2 (West 1992)). Mattis’ retirement began on May 15, 1994, when he was 55 years and 8 months old. If he had retired at this point without electing the early retirement option (ERO), his retirement annuity under Rules 1 and 3 of section 15–136 of the Pension Code would have been reduced by ½ of 1% for each month that he was under age 60. 40 ILCS 5/15–136(b) (West 1992). However, under section 136.2, which is titled “Early retirement without discount,” Mattis could “avoid the early retirement reduction in retirement annuity specified under subsection (b) of Section 15–136” if, at the time of his application for retirement, he elected “to make a one time employee contribution to the System.” 40 ILCS 5/15–136.2 (West 1992). The amount of this employee contribution was equal to 7% of the employee’s highest annual salary multiplied by the number of years the employee was less than age 60. Section 15–136.2 also provided that if an employee elected to make an ERO contribution to the system, the employer was obligated to make a lump sum contribution to the system. The amount of the employer contribution was equal to 20% of the employee’s highest annual salary multiplied by the number of years the employee was under 60.

Under a temporary amendment to the ERO provisions of section 15–136.2 in effect from July 1, 1993, to June 30, 1994, Mattis did not make an employee ERO contribution, as would normally have been required. Instead, Mattis’ employer, SIU, made both the employee and employer contributions under section 15–136.2. SIU’s one-time, lump sum payment to SURS totaled $122,928.60.

Section 15–136(a) of the Pension Code sets forth four formulas, or rules, by which the amount of a participant’s retirement annuity is determined. The statute provides that “[t]he amount of the retirement annuity shall be determined by whichever of the following rules is applicable and provides the largest annuity.” 40 ILCS 5/15–136(a) (West 1992). In the case at bar, the parties agree that only Rules 1 and 2 are relevant. Under Rule 1, the retirement annuity is calculated based on the number of years of service and the final rate of earnings. As noted, if a participant retires before age 60 without electing the ERO, the annuity calculated under Rule 1 is reduced by ½ of 1% for each month the participant is under age 60. Under Rule 2, the calculation is based on the participant’s contributions, rather than on years of service and rate of earnings. Because the Rule 2 calculation is based on contributions rather than years of service, there is no discount for early retirement under Rule 2 as there is with Rule 1.

SURS calculated Mattis’ retirement annuity under both Rule 1 and Rule 2. Under Rule 1, with the SIU lump sum payment taken into account, SURS determined that Mattis’ annuity was $2,815.98 per month. Without the SIU payment taken into account, Mattis’ annuity under Rule 1 would have been $2,097.91 a month. The difference is attributable to the early retirement discount, which Mattis avoided by electing the section 15–136.2 ERO. Under Rule 2, SURS determined that Mattis’ annuity was $2,586.37 per month. In making this calculation, SURS did not take the one-time SIU payment into account. Because Mattis’ annuity as calculated under Rule 1 was greater than the annuity under Rule 2, SURS began paying the Rule 1 annuity amount to Mattis upon his retirement on May 15, 1994. The first payment was made on June 1, 1994.

Mattis objected to SURS’s calculations, arguing that SIU’s lump sum payment of $122,928.60 should have been taken into account in determining his Rule 2 annuity amount. According to Mattis, if this had been done, his Rule 2 annuity would have been approximately $3,500 per month. Because this amount was greater than the $2,815.98 monthly annuity calculated by SURS under Rule 1, Mattis argued that it was this Rule 2 annuity amount that should have been paid to him.

On August 29, 1994, Mattis presented his claim before a hearing of the SURS claims committee. The committee recommended that Mattis’ claim be denied and that his retirement annuity remain at the amount calculated under Rule 1. In its findings and conclusions, the claims committee noted that the Rule 2 formula is based on “accumulated normal contributions” (40 ILCS 5/15–136(a)(i), (a)(ii) (West 1992)), and the committee questioned whether the legislature “considered a payment such as the $122,929.00 paid by Southern Illinois University under Section 5/15–136.2 [
sic
] to be an ‘accumulated normal contribution’ which must be included in calculating [Mattis’] retirement annuity under the money purchase formula [Rule 2].” The committee pointed to the definition of “normal contributions” in section 15–114, noting that this definition “stated that normal contributions are ‘specified under Section 15–157.’ ” The committee noted further that section 15–157, which is titled “Employee contributions,” deals only with employee contributions and “does not include contributions made by the employer.”

The committee saw “no indication that one[-]time employer contributions under Section 136.2 are to be considered normal contributions.” Accordingly, the committee concluded that “the Legislature did not intend to define Section 136.2 one[-] time early retirement contributions as ‘normal’ contributions such that they could be used in calculating a retirement annuity under the money purchase formula (40 ILCS 5/15–136(a) Rule 2).” The claims committee’s recommendation to deny Mattis’ claim was forwarded to the SURS board of trustees executive committee, which consisted of William Norwood, Emil Haeflinger, and Stanley Rives, the three individual defendants named in Mattis’ initial complaint in the case at bar. The executive committee affirmed the claims committee’s recommendation. This decision was forwarded to Mattis on January 13, 1995.

On February 16, 1995, Mattis filed his complaint in the circuit court of Champaign County against SURS and the individual members of the executive committee. As noted, in count I of the six-count complaint, Mattis sought administrative review of SURS’s denial of his claim. The remaining counts were brought on Mattis’ own behalf and on behalf of all those similarly situated. Counts II through V were common law claims brought under the circuit court’s original jurisdiction, and count VI was a civil rights claim under 42 U.S.C. §1983, also brought under the court’s original jurisdiction. All of the claims challenged SURS’s refusal to include the ERO payment in calculating the Rule 2 annuity amount.

The parties filed briefs on the statutory interpretation question, which the circuit court considered “the ultimate issue in the case.” The court found in favor of defendants on this question, concluding that ERO payments were not to be taken into account in making Rule 2 calculations. Mattis was allowed to amend his complaint to state additional facts and add equal protection claims to counts I, II and IV. He also added count VII, a claim for economic duress.

On April 29, 1996, the circuit court allowed count I to stand. However, based in part on the court’s previous resolution of the statutory interpretation question, the remaining counts were dismissed. On August 6, 1997, the circuit court denied Mattis’ motion for judgment on the pleadings and granted defendants’ motion for summary judgment on count I. The court confirmed SURS’s decision on the administrative review claim, stating that “the agency’s decision is not against the manifest weight of the evidence and is not contrary to law.”

On appeal, the appellate court reversed. 
Mattis
, 296 Ill. App. 3d 675. With regard to count I, the court concluded that SURS’s interpretation of the Pension Code provisions was incorrect and that the one-time ERO contribution from the employer had to be taken into account when calculating a retirement annuity under Rule 2. According to the appellate court, if the ERO contribution were not taken into account, SIU’s $122,000 contribution would be as much as $90,000 in excess of what SURS needed to fund Mattis’ pension under Rule 1. The question, the court asserted, was “what should be done with excess funds after the one-time contribution 
has been made
.” (Emphasis in original.) 
Mattis
, 296 Ill. App. 3d at 681. The court stated:

“Did the legislature intend all contributions on plaintiff’s behalf under the early retirement statute be attributed to the plaintiff’s retirement? On the other hand, did the legislature intend any excess funds be used to fund the System?” 
Mattis
, 296 Ill. App. 3d at 681.

To answer this question, the court focused in particular on section 15–185 of the Pension Code (40 ILCS 5/15–185 (West 1992)), which deals essentially with protecting a participant’s retirement benefits from creditors. The first sentence of section 15–185 states: “The accumulated employee and employer contributions 
shall be held in trust for each participant and annuitant
, and this trust shall be treated as a spendthrift trust.” (Emphasis added.) 40 ILCS 5/15–185 (West 1992). The court interpreted this statement as evidence that the legislature intended any excess funds to be used for the participant’s retirement and not to fund the system. The court stated:

“The existence of section 15–185, requiring employer contributions be held in trust for each annuitant, coupled with the absence of any statutory authority permitting the System to use the funds for its own purpose, mandates all of the funds contributed on plaintiff’s behalf pursuant to the ERO be used for plaintiff’s benefit. To do so in this case requires the computation of plaintiff’s retirement annuity according to the formula in Rule 2.” 
Mattis
, 296 Ill. App. 3d at 682.

With regard to the remaining counts in Mattis’ complaint, the court concluded that two of them had been abandoned, and the court reversed the dismissal of the four remaining counts. The cause was remanded to the circuit court.

Defendants sought review of the appellate court decision in this court, but their petition for leave to appeal was denied. 
Mattis v. State Universities Retirement System
, 179 Ill. 2d 587 (1998) (order). The cause was returned to the circuit court for further proceedings.

On October 8, 1999, the circuit court granted Mattis’ motion for class certification. The court certified a class consisting of all persons who elected to retire under section 15–136.2 through February 1, 2000. The court later modified the class definition to move the end date of the class to November 1, 2001.

On December 13, 1999, Mattis filed his third amended complaint. Counts I and II were brought by Mattis individually, and the remaining counts were brought on Mattis’ own behalf and on behalf of the class. As was the case previously, count I sought administrative review of SURS’s decision regarding the calculation of Mattis’ retirement annuity. Count II was for economic duress. Counts III and IV sought an accounting and a constructive trust, respectively, and count VI was for restitution and quasi contract. Count V, which was subsequently amended, was a civil rights claim under 42 U.S.C. §1983. All of the counts were based on SURS’s alleged misinterpretation of the statute and SURS’s alleged miscalculation of retirement annuities.

While the case was going forward in the circuit court, Public Act 91–887 was enacted by the General Assembly and signed into law by the Governor. Sections 20, 25 and 90 of Public Act 91–887, which took effect on July 6, 2000, are relevant to the case at bar. Section 20 amended sections 15–136, 15–136.2, and 15–185 of the Pension Code to reflect SURS’s interpretation of these provisions, 
i.e.
, that ERO payments are not to be taken into account when calculating retirement annuities under Rule 2. Section 20 amended Rule 2 of section 15–136(a) to state:

“The amount of a retirement annuity calculated under this Rule 2 shall be computed solely on the basis of the participant’s accumulated normal contributions, as specified in this Rule and defined in Section 15–116. Neither an employee or employer contribution for early retirement under Section 15–136.2 nor any other employer contribution shall be used in the calculation of the amount of a retirement annuity under this Rule 2.” Pub. Act 91–887, §20, eff. July 6, 2000.

Section 15–136.2
(footnote: 1) of the Pension Code was amended in a similar fashion to make the same point:

“Employee and employer contributions under this Section shall be used only to eliminate the reduction for early retirement under Rules 1 and 3 of Section 15–136 and shall not be used in calculating annuities under Rules 2 or 4 set forth in Section 15–136.” Pub. Act 91–887, §25, eff. July 6, 2000.

In addition, section 15–185 of the Pension Code was amended to state:

“This Section is not intended to, and does not, affect the calculation of any benefits under this Article or dictate how or to what extent employee or employer contributions are to be taken into account in calculating benefits.” Pub. Act 91–887, §25, eff. July 6, 2000.

Each of these amendments to sections 15–136, 15–136.2, and 15–185 is followed by this statement: “This amendatory Act of the 91st General Assembly is a clarification of existing law and applies to every participant and annuitant without regard to whether status as an employee terminates before the effective date of this amendatory Act.” In other words, these amendments apply to everyone who retired pursuant to the ERO provisions of section 15–136.2, regardless of whether they retired before the amendments went into effect.

Section 25 of Public Act 91–887 created a new Rule 5 in section 15–136(a) of the Pension Code. Under this new Rule 5, which appears to be something of a hybrid of Rules 1 and 2, ERO contributions are taken into account in calculating a retirement annuity. SURS estimates that, under Rule 5, Mattis’ annuity would have been approximately $3,090 per month as of the date of his retirement. Because this amount is higher than the $2,815.98 that SURS calculated under Rule 1, Mattis would have been paid the higher Rule 5 amount.

According to this Rule 5 amendment, the new Rule 5 applies to “a participant who elected early retirement under the provisions of Section 15–136.2 and who, 
on or before February 16, 1995
, brought administrative proceedings pursuant to the administrative rules adopted by the System to challenge the calculation of his or her retirement annuity.” (Emphasis added.) In other words, Rule 5 applies only to Mattis. It is undisputed that Mattis is the only person who challenged the calculation of his retirement annuity under the ERO provisions of section 15–136.2 “on or before February 16, 1995.” The General Assembly’s rationale for limiting Rule 5 to Mattis is stated in the amendment:

“The General Assembly has adopted the changes set forth in Section 25 of this amendatory Act of the 91st General Assembly in recognition that the decision of the Appellate Court for the Fourth District in Mattis v. State Universities Retirement System et al. might be deemed to give some right to the plaintiff in that case. The changes made by Section 25 of this amendatory Act of the 91st General Assembly are a legislative implementation of the decision of the Appellate Court for the Fourth District in Mattis v. State Universities Retirement System et al. with respect to that plaintiff.”

Section 90 of Public Act 91–887 stated the General Assembly’s intent regarding the severability of various provisions of the act. Section 90 first states, in subsection (a), that “[i]t is the intent of the General Assembly that the changes made by Section 25 of this amendatory Act of the 91st General Assembly are not severable from one another, and should any of the changes made by Section 25 be declared invalid, then the remainder of those changes shall not remain in effect.” Pub. Act 91–887, §90, eff. July 6, 2000. However, the remainder of Public Act 91–887 was meant to be fully severable. In subsection (b), section 90 states:

“Except as set forth in subsection (a), the provisions of this amendatory Act of the 91st General Assembly are severable under Section 1.31 of the Statute on Statutes. Without limiting the foregoing, it is the intent of the General Assembly that should the provisions of Section 25 of this amendatory Act of the 91st General Assembly be declared invalid, then the remainder of this Act shall remain in effect.” Pub. Act 91–887, §90, eff. July 6, 2000.

Based on Public Act 91–887, defendants moved for the administrative review claim in count I to be remanded to SURS for a recalculation of Mattis’ annuity under the new Rule 5. Defendants also moved for summary judgment on all other claims against them. Mattis also moved for summary judgment, and challenged the constitutionality of Public Act 91–887.

On August 24, 2001, the circuit court declared sections 20 and 25 of Public Act 91–887 unconstitutional, both facially and as applied. The court then held that the appellate court decision below was controlling, and remanded the administrative review claim in count I to SURS “for a recalculation of [Mattis’] pension in accordance with the language of the Appellate Court decision.”

Upon remand to SURS, the matter was again referred to the claims committee for consideration of the proper way of taking SIU’s ERO payment into account under Rule 2. The claims committee concluded that the fairest way to resolve the situation was simply to restore the parties to the positions they held before SIU’s $122,928.60 payment was made. The committee emphasized that it still believed that SURS’s initial interpretation of the statutory provisions was correct and that one-time ERO contributions were not intended to be used in calculating annuities under Rule 2. Nevertheless, in keeping with the appellate court decision below, the claims committee recommended that SURS repay the entire $122,928.60 ERO contribution to Mattis with interest. Offset against this amount would be the difference between the annuity payments Mattis had been receiving under Rule 1 with the ERO payment taken into account, and the amounts he would have received under Rule 2 if the ERO payment had never been made. On June 7, 2002, SURS’s board of trustees adopted the claims committee’s recommendation with minor modifications.

Meanwhile, in the circuit court the parties proceeded with the remaining claims. By agreement of the parties, count II of the third amended complaint (economic duress) was dismissed. On motion of defendants, the circuit court dismissed counts III, IV and VI on the ground that the court lacked subject matter jurisdiction over these counts. The circuit court subsequently dismissed the section 1983 claim (count V), and denied Mattis’ motion to add counts VII and VIII. This left only count I still before the circuit court.

On January 7, 2003, the circuit court held that Mattis was entitled to an award of attorney fees and expenses from SURS as to the administrative review claim in count I. The court based its decision on section 10–55(c) of the Illinois Administrative Procedure Act (5 ILCS 100/10–55(c) (West 2002)), which provides that reasonable expenses of litigation, including reasonable attorney fees, are to be awarded to a party bringing an action where the “party has any administrative rule invalidated by a court for any reason.” 5 ILCS 100/10–55(c) (West 2002). In the case at bar, the administrative rule that was invalidated, the court found, was SURS’s consistent policy over the years of not taking ERO payments into account when calculating annuities under Rule 2.

On March 14, 2003, the circuit court entered judgment on count I in favor of Mattis and against defendants. Under the administrative decision previously entered by the SURS board of trustees regarding the proper method of resolving Mattis’ administrative claim, the court concluded that Mattis was entitled to receive from SURS a lump sum of $152,984.37, as well as a monthly annuity payment of $3,333.67. The court also awarded Mattis’ attorneys more than $300,000 in attorney fees and expenses. The judgment as to count I brought the lawsuit to an end in the circuit court.

Defendants appeal from several judgments regarding count I of the third amended complaint, including: (1) the circuit court’s order declaring sections 20 and 25 of Public Act 91–887 unconstitutional, (2) the circuit court order holding that Mattis was entitled to attorney fees and expenses under section 10–55(c) of the Administrative Procedure Act, and (3) the circuit court judgment as to count I entered against defendants on March 14, 2003, and any previous judgments or orders that were steps in the procedural progression leading to the March 14, 2003, judgment. As noted, defendants’ appeal was docketed as cause No. 96012.

Mattis appeals from the circuit court orders dismissing counts III, IV, V and VI of the third amended complaint. Upon motion of defendants, Mattis’ appeal, which was docketed as cause No. 96114, was consolidated with appeal No. 96012.

ANALYSIS

Early in the course of the lengthy litigation underlying these appeals, the circuit court observed that it was the statutory interpretation question that was “the ultimate issue” in the case. That observation, made in 1996 when this dispute was still relatively young, applies with the same force to the case as it stands today. It is the proper construction of Pension Code provisions such as sections 15–136, 15–136.2, and 15–185 that lies at the core of the dispute between the parties.

We begin our analysis with an examination of the appellate court opinion below. As noted, the appellate court held that SURS had misconstrued the relevant provisions of the Pension Code, and had improperly failed to take SIU’s $122,000 ERO contribution into account when calculating Mattis’ annuity amount under Rule 2. If we find that the appellate court was correct in this decision, we can then proceed to examine the remaining issues in this case, including the constitutionality of Public Act 91–887. However, if we conclude that the appellate court was incorrect and that SURS’s interpretation of the statute was proper, there will be no need to address the constitutional questions raised concerning Public Act 91–887. As noted, Public Act 91–887’s amendments to the relevant Pension Code provisions simply reflect SURS’s construction of the statute. It is axiomatic that “questions regarding the constitutionality of statutes should be considered ‘only where essential to the disposition of a case, 
i.e.
, where the case cannot be determined on other grounds.’ ” 
Hearne v. Illinois State Board of Education
, 185 Ill. 2d 443, 454 (1999), quoting 
Bonaguro v. County Officers Electoral Board
, 158 Ill. 2d 391, 396 (1994).

We note in addition that deciding this case on nonconstitutional grounds would be appropriate even though our jurisdiction under Rule 302(a) (134 Ill. 2d R. 302(a)) is based on the circuit court’s invalidation of sections 20 and 25 of Public Act 91–887. “This court will not address constitutional issues that are unnecessary for the disposition of the case under review even though the court acquires jurisdiction of the case because a constitutional question is involved.” 
Evans v. Shannon
, 201 Ill. 2d 424, 441 (2002).

Moreover, this court is free to review the appellate court decision in this case even though we previously denied defendants’ petition for leave to appeal from this same decision. 
Mattis v. State Universities Retirement System
, 179 Ill. 2d 587 (1998) (order). The denial of a petition for leave to appeal “ ‘has no precedential effect and in no way amounts to a consideration of the merits of the case[ ]. Nor does it indicate approval of the appellate court’s action.’ ” 
Garibaldi v. Applebaum
, 194 Ill. 2d 438, 447 (2000), quoting 
Relph v. Board of Education of DePue Unit School District No. 103
, 84 Ill. 2d 436, 442 (1981). This is the first time this case has been before us on the merits, and our review of it “ ‘may cover all matters properly raised and passed on in the course of litigation.’ ” 
Garibaldi
, 194 Ill. 2d at 447, quoting 
Relph
, 84 Ill. 2d at 442.

We note our standard of review. The interpretation of statutory provisions is a question of law. Accordingly, we review the appellate court’s interpretation of the relevant Pension Code provisions 
de novo
. 
Shields v. Judges’ Retirement System of Illinois
, 204 Ill. 2d 488, 492 (2003). As a general rule, we accord deference to the interpretation of a statute by the agency charged with its administration. However, the agency’s interpretation will be rejected if it is erroneous. 
Shields
, 204 Ill. 2d at 492, citing 
City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268
, 122 Ill. 2d 353, 361 (1988).

The controlling principles of statutory construction are well established. “In interpreting a statute, a court’s primary goal is to ascertain the intent of the legislature.” 
Land v. Board of Education of the City of Chicago
, 202 Ill. 2d 414, 421 (2002), citing 
Paris v. Feder
, 179 Ill. 2d 173, 177 (1997). “The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning.” 
Paris
, 179 Ill. 2d at 177. If the legislative intent can be discerned from the statutory language, this intent must prevail, and no resort to other tools of statutory construction is necessary. 
Land
, 202 Ill. 2d at 421-22; 
Illinois Power Co. v. Mahin
, 72 Ill. 2d 189, 194 (1978). This court has held that the language of pension statutes should be liberally construed in favor of the rights of the pensioner. 
Shields
, 204 Ill. 2d at 494. However, this canon of construction has its bounds. “ ‘[W]hile a pension act should be liberally construed to effect the object sought to be accomplished, yet if the legislative intention is obvious from the language used that intention must be made effective, and the judiciary will not be warranted in giving the act a meaning not expressed in it.’ ” 
Robbins v. Board of Trustees of the Carbondale Police Pension Fund
, 177 Ill. 2d 533, 545 (1997), quoting 
Sup v. Cervenka
, 331 Ill. 459, 463 (1928). “It is also a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied.” 
Knolls Condominium Ass’n v. Harms
, 202 Ill. 2d 450, 459 (2002).

At the time of Mattis’ retirement, Rule 2 of section 15–136(a) provided:

“Rule 2: The retirement annuity shall be the sum of the following, determined from amounts credited to the participant in accordance with the actuarial tables and the prescribed rate of interest in effect at the time the retirement annuity begins:

(i) The normal annuity which can be provided on an actuarial[ly] equivalent basis, by the
 accumulated normal contributions 
as of the date the annuity begins; and

(ii) an annuity from employer contributions of an amount which can be provided on an actuarially equivalent basis from the 
accumulated normal contributions 
made by the participant under Section 15–113.6 and Section 15–113.7 plus 1.4 times all other 
accumulated normal contributions 
made by the participant.” (Emphases added.) 40 ILCS 5/15–136(a) (West 1992).

This language clearly shows that the calculation of retirement annuities under Rule 2 is based on “accumulated normal contributions.” The term “accumulated normal contributions” is defined in the statute as “[t]he sum of all normal contributions credited to an employee’s account, together with interest thereon at the effective rate for the respective years.” 40 ILCS 5/15–116 (West 1992). “Normal contributions,” in turn, are defined in section 15–114 (40 ILCS 5/15–114 (West 1992)) to include three categories of employee contributions: (1) “[t]he required contributions specified under Section 15–157 as normal contributions”; (2) “amounts paid by a participant for annuity contracts assigned to the board in order to obtain service credit for employment by affiliated alumni associations, foundations, and athletic associations”; and (3) “amounts contributed by a participant under Section 15–113.5 [for service with other public agencies in Illinois], Section 15–113.6 [for service in public schools] and Section 15–113.7 [for service for certain other public employment].”

The first of these categories of contributions, 
i.e.
, “required contributions specified under Section 15–157 as normal contributions,” refers to the contributions made by each employee of 6 ½% (or, in the case of firefighters or police officers, 8%) of “each payment of earnings” (40 ILCS 5/15–157(a) (West 1992)).

Nowhere in these descriptions of contributions is there any mention of ERO contributions under section 15–136.2. Accordingly, we infer that the “accumulated normal contributions” upon which Rule 2 calculations are based do not include ERO contributions such as SIU’s $122,000 payment to SURS in the case at bar. “Where a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions.” 
Bridgestone/Firestone, Inc. v. Aldridge
, 179 Ill. 2d 141, 151-52 (1997); see also 
State Farm Mutual Automobile Insurance Co. v. Universal Underwriters Group
, 182 Ill. 2d 240, 244 (“It is well established that when a statute defines the terms it uses, those terms must be construed according to the definitions contained in the act”).

Also relevant to our analysis are the ERO provisions of section 15–136.2 of the Pension Code. The version of section 15–136.2 that was in effect at the time of Mattis’ retirement provided, in pertinent part:

“Early retirement without discount. A participant whose retirement annuity begins after June 1, 1981 and on or before September 1, 1997 and within six months of the last day of employment for which retirement contributions were required, may elect at the time of application to make a one time employee contribution to the System and 
thereby avoid the early retirement reduction in retirement annuity specified under subsection (b) of Section 15–136
. The exercise of the election shall obligate the last employer to also make a one time non-refundable contribution to the System.” (Emphasis added.) 40 ILCS 5/15–136.2 (West 1992).

Under the plain language of section 15–136.2, the purpose of the one-time employee contribution, and, by inference, the one-time employer contribution, is to “avoid the early retirement reduction in retirement annuity specified under subsection (b) of Section 15–136.” 40 ILCS 5/15–136.2 (West 1992). As previously noted, the early retirement reduction specified in section 15–136(b) applies to Rules 1 and 3. There is no mention of Rule 2 in section 136(b), which provides, in pertinent part:

“(b) The retirement annuity provided under Rules 1 and 3 above shall be reduced by ½ of 1% for each month the participant is under age 60 at the time of retirement.” 40 ILCS 5/15–136(b) (West 1992).

The specific reference in section 15–136.2 to section 15–136(b), which itself mentions Rules 1 and 3 but makes no mention of Rule 2, lends support to the conclusion that one-time ERO contributions under section 15–136.2 are not to be taken into account in calculating retirement annuities under Rule 2. See 
Bridgestone/Firestone
, 179 Ill. 2d at 151-52. As section 15–136.2 clearly states, the one-time ERO contributions are to avoid the ½ of 1% per month early retirement reductions under Rules 1 and 3.

In opposing SURS’s interpretation of the relevant statutory provisions and SURS’s resulting calculation of annuities under Rule 2, both the appellate court and Mattis point to section 15–185 of the Pension Code, particularly the first sentence of this provision: “
The accumulated employee and employer contributions shall be held in trust for each participant and annuitant
, and this trust shall be treated as a spendthrift trust.” (Emphasis added.) 40 ILCS 5/15–185 (West 1992). Mattis notes in particular the requirement that the contributions “shall be held in 
trust
” (emphasis added) (40 ILCS 5/15–185 (West 1992)), and concludes that the first clause of this first sentence “imposes upon SURS a duty to act as a fiduciary with regard to all employer and employee contributions and to dedicate the property in the trust to the beneficiaries’ equitable interests.” In Mattis’ view, if all employee and employer contributions are to be held in trust for the benefit of each participant, as section 15–185 requires, this means that ERO contributions, which consist of employee and employer contributions made under section 15–136.2, must therefore be taken into account in calculating a retirement annuity under Rule 2, just as they are when calculating an annuity under Rule 1. The rationale underlying this assertion is as follows. Mattis notes that, in the case at bar, the Rule 2 benefit calculated for him by SURS, which did not take into account SIU’s $122,928.60 ERO contribution, totaled $2,586.37 per month. Mattis’ monthly benefit calculated under Rule 1, where the ERO contribution was taken into account, was $2,815.98. Because SURS’s Rule 1 calculation for Mattis was higher than the Rule 2 calculation, SURS began paying Mattis the Rule 1 benefit, which was $229.61 per month more than his Rule 2 benefit would have been. However, Mattis argues that if SIU’s $122,928.60 ERO contribution had been taken into account in calculating his Rule 2 benefit, this benefit would have been higher than the $2,815.98 Rule 1 amount, and Mattis therefore would have received the more generous Rule 2 annuity. Mattis contends that SIU’s $122,928.60 ERO contribution gave SURS some $93,000 more than it needed to fund the $229.61 monthly increase that he actually received. In Mattis’ view, SURS’s refusal to include the ERO contribution in the Rule 2 calculation meant that $93,000 of SIU’s ERO contribution ended up being used for purposes other than to benefit Mattis. According to Mattis, this constituted a violation of section 15–185, which, in his view, requires that all employee and employer contributions, including ERO contributions, are to be held in trust for “each participant,” not for the benefit of the system.

Defendants point to the second clause in the first sentence of section 15–185, which states that the trust referred to in the first clause “shall be treated as a spendthrift trust.” 40 ILCS 5/15–185 (West 1992). A “spendthrift trust” is “[a] trust that prohibits the beneficiary’s interest from being assigned and also prevents a creditor from attaching that interest.” Black’s Law Dictionary1518 (7th ed. 1999). Defendants also point to the second sentence of section 15–185, which provides:

“Except as provided in this Article, all cash, securities and other property of this system, all annuities and other benefits payable under this Article, and all accumulated credits of participants and annuitants in this system and the right of any person to receive an annuity or other benefit under this Article, or a refund of contributions, 
shall not be subject to judgment, execution, garnishment, attachment, or other seizure by process, in bankruptcy or otherwise
, nor to sale, pledge, mortgage or other alienation, and shall not be assignable.” (Emphasis added.) 40 ILCS 5/15–185 (West 1992).

Defendants contend that, given the reference to “spendthrift trust” in the first sentence, as well as the specific protections provided to participants and annuitants in the second sentence, “the most natural reading of section 15–185, when read as a whole, is that it is meant to protect retirement and other benefits from a participant’s creditors.” In defendants’ view, the emphasis when construing section 15–185 should be more on the protections provided against creditors than on the requirement that contributions be held in trust for the benefit of each participant.

We agree with Mattis that, under the plain language of the first sentence of section 15–185, there exists a trust relationship between SURS and the system’s participants. However, we do not agree that this sentence requires ERO contributions such as SIU’s one-time payment of $122,928.60 to be taken into account in calculating benefits under Rule 2. First, we note that section 15–185 makes no mention of calculation of benefits. Second, it is axiomatic that “a trustee is under the duty to conform to the terms of the trust.” 
Merchants National Bank of Aurora v. Frazier
, 329 Ill. App. 191, 200-01 (1946); see also 
Dick v. Peoples Mid-Illinois Corp.
, 242 Ill. App. 3d 297, 303 (1993) (trustee is obligated, 
inter alia
, “to carry out the trust according to its terms”); 40 ILCS 5/1–109(d) (West 1992) (a fiduciary with respect to a retirement system or pension fund shall discharge his or her duties “[i]n accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund”).

In the case at bar, the terms of the trust are the terms of article 15 of the Pension Code, which is the portion of the Code that governs SURS. As noted, under the plain language of section 15–136(a) of the Code, the calculation of retirement annuities under Rule 2 is based on “accumulated normal contributions.” 40 ILCS 5/15–136(a) (West 1992). However, the provisions defining these contributions make no mention of ERO contributions under section 15–136.2. See 40 ILCS 5/15–114, 15–116, 15–157 (West 1992). Moreover, under section 15–136.2, the purpose of the ERO contributions is to “avoid the early retirement reduction in retirement annuity specified under subsection (b) of Section 15–136.” 40 ILCS 5/15–136.2 (West 1992). Subsection (b) of section 15–136, in turn, describes the retirement reduction that applies under Rules 1 and 3, but makes no mention of Rule 2. These statutory provisions, to which SURS has a duty to conform (see 
Merchants National Bank
, 329 Ill. App. at 200-01), support SURS’s conclusion that ERO contributions under section 15–136.2 are not to be taken into account in calculating retirement annuities under Rule 2.

Even if it could be shown that the general “held in trust” language of section 15–185 had some effect on the calculation of annuities under Rule 2, it is the specific provisions of sections 15–136(a) and 15–136.2 that would control here. “It is *** a fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or in another act, both relating to the same subject, the specific provision controls and should be applied.” 
Knolls Condominium Ass’n
, 202 Ill. 2d at 459. In the case at bar, as noted, the relevant specific provisions support the view that ERO contributions are not to be considered in calculating Rule 2 benefits.

We note that the statutory amendments included in Public Act 91–887 provide additional guidance in ascertaining the legislature’s intent in enacting the relevant preamendment portions of article 15. “Where *** the legislature amends a statute soon after a controversy arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original statute.” 
Church v. State
, 164 Ill. 2d 153, 163 (1995); 1A N. Singer, Sutherland on Statutory Construction §22.31, at 380 (6th ed. 2002); see 
Varelis v. Northwestern Memorial Hospital
, 167 Ill. 2d 449, 461-63 (1995). As noted, the amendments to sections 15–136 and 15–136.2 clearly state that ERO contributions are to be used only to eliminate the reduction for early retirement under Rules 1 and 3 of section 15–136 and are not to be used in calculating annuities under Rule 2. The amendment to section 15–185 states: “This Section is not intended to, and does not, affect the calculation of any benefit under this Article or dictate how or to what extent employee or employer contributions are to be taken into account in calculating benefits.” The Public Act 91–887 amendments clearly support the view that the legislature did not intend for ERO contributions under section 15–136.2 to be taken into account in calculating retirement annuities under Rule 2 of section 15–136(a).

Accordingly, we reject the appellate court’s and Mattis’ conclusion that ERO contributions such as SIU’s $122,928.60 payment to SURS must be taken into account when calculating retirement benefits under Rule 2. The plain language of the relevant portions of article 15 of the Pension Code supports SURS’s interpretation of these provisions.

Given our interpretation of the relevant statutory provisions,  we reverse the judgment of the circuit court in favor of Mattis and against defendants on count I of the third amended complaint. We also reverse the circuit court order awarding attorney fees and expenses to Mattis’ attorneys, which was based on the judgment in favor of Mattis on count I. The orders of the circuit court regarding the remainder of Mattis’ claims, including the orders dismissing counts III, IV, V and VI of the third amended complaint, are affirmed. (Count II was dismissed by agreement of the parties.)

Because of our disposition of this case, we need not address the constitutionality of sections 20 and 25 of Public Act 91–887. 
Hearne
, 185 Ill. 2d at 454. These provisions, as noted, support SURS’s interpretation of the relevant portions of article 15, an interpretation that is confirmed by our decision today.

We note, in addition, that while the circuit court’s decision invalidating sections 20 and 25 was not advisory at the time it was entered, in light of our ruling today, the circuit court’s decision is now wholly advisory, as would be any statements made by this court on this issue. See 
Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134, 157 (2002). We therefore vacate the circuit court’s decision invalidating sections 20 and 25 of Public Act 91–887. See 
Oliveira
, 201 Ill. 2d at 157. 

CONCLUSION

The judgments below are affirmed in part, reversed in part, and vacated in part, and the cause is remanded to the circuit court with directions that it order SURS to recalculate Mattis’ annuity under the new Rule 5 of section 15–136(a), and for other proceedings consistent with this opinion.

Affirmed in part, reversed in part,

and vacated in part;

cause remanded with directions.

JUSTICE GARMAN took no part in the consideration or decision of this case.

JUSTICE RARICK, dissenting:

We had the opportunity to review the appellate court’s decision in this case six years ago. We declined to do so. Defendants’ petition for leave to appeal was denied, the mandate of the appellate court issued, and the cause was remanded to the circuit court for further proceedings. Considerable effort was subsequently expended by the parties, the circuit court and the General Assembly based on the appellate court’s interpretation of the law. Given all that has transpired during the intervening six years, subjecting the appellate court’s judgment to review on the merits at this late date offends basic principles of judicial stability.

There is nothing about the appellate court’s opinion that makes it any more worthy of our consideration now than it was when we denied defendants’ petition for leave to appeal in 1998. The merits of the appellate court’s opinion are, in fact, wholly unrelated to why the matter has come before us again. The case is on our docket today solely because of the circuit court’s subsequent determination that the General Assembly’s attempt to alter the appellate court’s judgment was invalid. Our jurisdiction is invoked under Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). It is the circuit court’s judgment invalidating the statutory amendments to the Pension Code, not anything said or done by the appellate court in its prior judgment, that triggered that jurisdiction.

For the majority to reverse a six-year-old appellate court judgment that fully resolved the governing legal issues in a case, as it does here, is unprecedented. 
Garibaldi v. Applebaum
, 194 Ill. 2d 438 (2000), and 
Relph v. Board of Education of DePue Unit School District No. 103
, 84 Ill. 2d 436 (1981), the two cases cited by the majority to justify its action, involved fundamentally different circumstances.
 In 
Relph,
 the appellate court initially reversed the circuit court’s judgments based on its construction of a certain statutory provision and remanded the petitioners’ causes of action to the circuit court with directions to enter judgment in their favor. While those proceedings were still pending, this court issued an opinion in 
Lenard v. Board of Education of Fairfield School District No. 112
, 74 Ill. 2d 260 (1979), which construed the applicable law differently than the appellate court had in petitioners’ cases. The question presented was whether the appellate court’s decisions should still be followed or whether the viability of petitioners’ claims should be reconsidered in light of 
Lenard.
 The circuit court felt bound to apply the appellate court’s judgments, and the appellate court affirmed. We granted the defendant’s petitions for leave to appeal and reversed, holding that to avoid “illogical results,” the cases should have been decided on their second appeal in accordance with our decision in 
Relph
, 84 Ill. 2d at 444.

 Significantly, the only judgments we reversed in 
Relph
 were the judgments then being appealed. We did not purport to reach back and reverse any prior judgments, as the majority does in this case. Properly considered, 
Relph
 was no more than an illustration of the well-established principle that opinions by our court are not normally limited to prospective application. They are also presumed to apply to all cases pending at the time the decision is announced. See 
Tosado v. Miller
, 188 Ill. 2d 186, 196 (1999); 
Deichmueller Construction Co. v. Industrial Comm’n
, 151 Ill. 2d 413, 416 (1992). That principle, however, has no relevance to Professor Mattis’ case. Here, unlike 
Relph
, there was no intervening decision by this or any other court that called the appellate court’s construction of the law into question. So far as the courts were concerned, the appellate court’s construction of the law was settled. As I have mentioned, this appeal is before us only because the circuit court struck down, as unconstitutional, the General Assembly’s attempt to overrule the appellate court legislatively.

Garibaldi, 
the other case cited by the majority, is also inapposite.
 
It involved challenges to the viability of a cause of action asserted by a physician based on a hospital’s alleged failure to comply with certain of its bylaws related to medical staffing decisions. After the circuit court entered summary judgment in favor of defendants on count I of the physician’s three-count complaint, the physician brought an interlocutory appeal to the appellate court under Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). The appellate court reversed entry of summary judgment and remanded for further proceedings. We declined to intervene at that stage of the proceedings and denied the defendants’ petitions for leave to appeal.

After the matter was remanded to the circuit court, the physician’s claim for injunctive relief under count I was dismissed as moot. The physician appealed again. By this time, the physician had also appealed from a separate judgment entered by the circuit court granting summary judgment in favor of defendants on counts II and III of the physician’s complaint. Those appeals were consolidated by the appellate court, which affirmed the dismissal of the physician’s claim for injunctive relief, but reversed the grant of summary judgment in favor of defendants on counts II and III. We subsequently granted leave to appeal, affirmed in part, reversed in part and remanded to permit the circuit court to address two additional counts asserted by the physician in an amended complaint.

There is no similarity between our court’s resolution of 
Garibaldi 
and what it has done in the present case. As the foregoing discussion has shown, the initial appeal in 
Garibaldi 
was interlocutory. It arose at an early stage of the proceedings and dealt with the viability of only one aspect of the plaintiff’s claim. In contrast to the present case, it did not entail a comprehensive review of the plaintiff’s cause of action following a trial and did not finally determine the plaintiff’s claims on the merits. It merely reversed the entry of summary judgment, allowing the plaintiff to continue to pursue count I of his complaint along with the remaining counts, which were unaffected by the appellate court’s ruling. 

When Garibaldi’s case came up on appeal the second time, it was not because the General Assembly had attempted to legislatively overrule the appellate court’s opinion, as happened here. It was simply because the case had finally progressed to its conclusion in the trial court. In contrast to the present case, the second appeal did not reverse, alter, or even question the appellate court’s initial ruling. The appellate court’s first decision remained undisturbed. During the second appeal, neither this court nor the appellate court held that reversal of summary judgment as to count I had been a mistake. Count I was disposed of on the wholly separate grounds that subsequent events had rendered plaintiff’s claims under that count moot. 
Garibaldi
 therefore offers no support for the majority’s action today.

As an additional basis for justifying its decision, the majority invokes the axiom that questions regarding the constitutionality of a statute should be considered only where essential to the disposition of the case. I agree with that axiom. I cannot understand how it applies here. The axiom would be relevant if the majority’s opinion concluded that Mattis was not subject to the statutory amendments he challenges as unconstitutional. If the amendments did not apply, their constitutionality would not affect the outcome of Mattis’ case, and there would be no need to address it. The majority’s analysis, however, does not avoid application of the statute. To the contrary, it makes clear that the statute is to serve as the basis for calculating Mattis’ pension. Given that the challenged statute will determine Mattis’ income for the rest of his life, its validity not only remains relevant to his cause of action, it is dispositive.

How the majority hoped to avoid this basic flaw in its analysis is unclear. One hint is provided in the second paragraph of the “Analysis” section of the opinion. It appears from that discussion that my colleagues were under the impression that if the statutory amendments merely codified SURS’s construction of the prior law, and if SURS’s construction of the prior law were correct, then the statutory amendments did not, in fact, alter the outcome and their constitutionality would therefore be immaterial to the resolution of this case. That argument, however, is untenable. First, with respect to separation of powers concerns, the problem with the General Assembly’s actions, and the reason the amendments are unconstitutional, is unrelated to the merits of the appellate court’s judgment. Whether that judgment needed to be reversed is irrelevant. In terms of constitutional analysis, the salient point is that the General Assembly was not the proper body to try to reverse it.

Second, the majority’s rationale overlooks the fact that the statutory amendments were not limited to clarification of the prior law. They added entirely new provisions, including provisions limited exclusively to Mattis. Because the new provisions did not previously exist, and because those new provisions alter the pension benefits Mattis stands to receive, a determination as to whether SURS’s interpretation of the prior law was correct is not sufficient to resolve this case. 
The constitutionality of the statutory amendments must still be considered. 

This litigation began nearly a decade ago when SURS determined that it was going to pay Professor Mattis a lower pension benefit than he believed the law required. SURS calculated Mattis’ benefit to be $2,815.98 per month under the law then in effect. Mattis, however, thought he was entitled to approximately $3,500 per month. The difference was related to a large lump-sum contribution Mattis’ employer had made to the retirement system on his behalf to enable him to take advantage of an early retirement option.

At the time, the Pension Code included four different rules for calculating the amount of a university employee’s pension benefit. A retiree’s benefit was determined by whichever of the rules applied to his situation and provided the largest annuity. Two of the rules, Rule 1 and Rule 2, pertained to Mattis’ case. The first rule, which is the one on which Mattis’ benefit was based, took into account his employer’s lump-sum contribution. The second rule, as construed by SURS, did not. 

Mattis asserted that SURS construction of Rule 2 was erroneous. He argued that under the law, SURS should have considered the employer’s lump-sum contribution when applying the formula set out in Rule 2, just as it had in applying Rule 1. Had that contribution been factored into the Rule 2 computation, Mattis argued, it would have yielded the higher benefit he claimed.

The circuit court concurred in SURS’s interpretation of the relevant statutes. The appellate court did not. It agreed with Mattis that he was entitled to the full benefit of his employer’s lump-sum contribution under Rule 2. It therefore reversed and remanded for further proceedings, including recomputation of Mattis’ pension benefits under the Rule 2 formula. 
Mattis
, 296 Ill.App. 3d at 682. On remand, the circuit court followed the appellate court’s directive and concluded that Mattis should receive a lump-sum payment of $152,984.37 plus monthly payments of $3,333.67.

After the appellate court’s judgment had become final, but while the case was still pending on remand, the General Assembly amended the Pension Code to change the way in which Mattis’ pension should be computed. The amendments rejected the appellate court’s construction of the law and expressly provided that employer contributions were not to be taken into account in calculating the amount of the retirement benefit due under the Rule 2 formula. The amendments also created a new, additional rule, for computing benefits. The new rule, known as Rule 5, was fashioned solely to address Mattis’ claims. It provided a limited exception, available only to him, from the new statutory prohibition against use of an employer’s contribution in computing the pension benefit. Under the new rule, Mattis qualifies for a benefit of $3,090 per month. That is more than the $2,815.98 per month SURS had been willing to pay, but less than the $3,337.67 per month plus $152,984.37 lump-sum payment Mattis was awarded pursuant to the appellate court’s construction of the law as it existed when his claim arose and the appellate court’s judgment became final.

The legislature may change the law as interpreted by the courts prospectively. It cannot, however, alter a statute retroactively in such a way that the statute itself overrules a decision of a reviewing court. Such action violates basic principles of separation of powers and is unconstitutional. 
In re Marriage of Cohn
, 93 Ill. 2d 190, 201-04 (1982). Although the majority attempts to minimize the impact of the actions taken by the legislature in this case, the consequences of its amendments to the Pension Code are sweeping. Those amendments effectively nullify the appellate court’s decision and deny Mattis the benefit of the judgment he obtained there. In my view, it is difficult to imagine a more blatant violation of separation of powers principles. The circuit court was therefore correct to declare the amendments to the Pension Code unconstitutional.

As I have already noted, the majority’s decision to reach back and reverse the appellate court’s decision in favor of Mattis does not cure the amendments’ constitutional infirmity. It is for the judiciary alone to interpret the law and decide how it should be applied in a particular case. If the lower courts err in undertaking those responsibilities, we can reverse them. The legislature cannot. Under the Illinois Constitution, the General Assembly has no right to assume for itself the role of a court of last resort. See 
Roth v. Yackley
, 77 Ill. 2d 423, 428-29 (1979). By enacting the amendments to the Pension Code to change the outcome of this case, however, that is precisely what the General Assembly attempted to do. When we refused to allow the petition for leave to appeal in 1998, it decided to step in and sort things out in our stead. Such action cannot be squared with Illinois law.

 Article II, section 1, of the Illinois Constitution (Ill. Const. 1970, art. II, §1) expressly prohibits any of the three branches of government from exercising “powers properly belonging to another.” That prohibition embodies the doctrine of separation of powers, which has been a hallmark of American government since ratification of the United States Constitution. Separation of powers is not a matter of bureaucratic convenience. It is a vital component of our system of checks and balances.

The doctrine of separation of powers requires that a line be drawn between the functions of the courts and the functions of the legislature. Nothing in the majority’s opinion alters the fact that when the General Assembly enacted the amendments to the Pension Code at issue here, it crossed that line. Unconstitutional in their inception, the amendments are unconstitutional still. As such, they should be rejected as void and unenforceable. I must therefore respectfully dissent.

JUSTICE KILBRIDE joins in this dissent.

FOOTNOTES
1:     
1
The ERO provisions of section 15–136.2, in its current version, apply to participants whose retirement annuity begins on or before September 1, 2002. 40 ILCS 5/15–136.2 (West 2002). Apparently these provisions have been allowed to expire, but they are still relevant to Mattis and others whose retirement annuities began on or before September 1, 2002.