2015 IL App (4th) 140401

NO. 4-14-0401

FILED
March 5, 2015
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THOMAS NUZZI and DEBORAH NUZZI, | ) | Appeal from |
|     Plaintiffs-Appellants, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| THE BOARD OF TRUSTEES OF THE TEACHERS' | ) | No. 12MR824 |
| RETIREMENT SYSTEM OF THE STATE OF | ) | |
| ILLINOIS and THE TEACHERS' RETIREMENT | ) | |
| SYSTEM OF THE STATE OF ILLINOIS, | ) | Honorable |
|     Defendants-Appellees. | ) | John P. Schmidt, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiffs, Thomas Nuzzi and Deborah Nuzzi, are married to each other and are the former superintendent and former principal, respectively, at St. George Community Consolidated School District (St. George). In August and September 2008, Deborah and Thomas, respectively, were awarded disability benefits by the Teachers' Retirement System (TRS) based on their post-traumatic stress disorder. In March 2010, TRS began investigating plaintiffs' employment as adjunct web-based instructors at Olivet Nazarene University. In March 2010, TRS notified Thomas his right to receive disability benefits terminated on January 28, 2009, due to his employment and sought reimbursement of $46,959.91. In May 2010, TRS informed Deborah her right to receive disability benefits terminated February 2, 2009, due to her

employment and demanded reimbursement of $37,218.61. Plaintiffs appealed the TRS staff determination.

¶ 2      In April 2012, a TRS claims-hearing committee (Hearing Committee) issued a written recommended decision upholding the TRS staff's determination plaintiffs were required to reimburse TRS. The Hearing Committee, quoting the statute, found plaintiffs lost their eligibility to continue receiving disability benefits because they "were both 'employed… in an equivalent capacity as a teacher in a … private … university' in derogation of [section] 16-149.2(a)" of the Illinois Pension Code (Pension Code) (40 ILCS 5/16-149.2(a) (West 2008)). In August 2012, the TRS Board of Trustees (TRS Board) voted to uphold the recommended decision of the Hearing Committee. Plaintiffs sought administrative review. In April 2013, the circuit court affirmed the TRS Board's decision.

¶ 3      Plaintiffs appeal, asserting (1) the pertinent sections of the Pension Code are ambiguous and inconsistent; (2) section 16-149, not section 16-149.2, applies to this case; and (3) their employment at Olivet Nazarene University does not violate section 16-149(c).

¶ 4      We affirm.

¶ 5                          I. BACKGROUND

¶ 6      The facts in the underlying administrative matter are not in dispute. Plaintiffs are the former superintendent and former principal of St. George. In May 2004, Thomas signed a four-year employment contract, which ran from June 10, 2004, to June 30, 2008. Deborah entered into a written contract for the 2006-07 school year and in August 2007, she renewed her annual contract, which began on July 1, 2007, and ended June 30, 2008. As a result of their employment, plaintiffs participated in TRS.

¶ 7        In February 2007, the Board of Education of St. George (School Board) became aware Thomas was paying Deborah more than the salary stated in her contract and was moving money between accounts to avoid detection. It also learned Thomas was submitting duplicate requests for reimbursement and submitted false attendance records to the Illinois State Board of Education. The Federal Bureau of Investigation and Illinois State Police conducted an investigation but a criminal prosecution had not been initiated against plaintiffs.

¶ 8        In August 2007, the School Board decided to hire an auditor to conduct a full audit of St. George's finances. Several School Board members were concerned because Thomas had not been able to provide adequate financial information. In September 2007, Thomas installed a key card security system, rendering the School Board members' old keys useless and cutting off their access to the school building when the building was closed. The School Board asked Thomas to provide key cards so School Board members could get into the building, but Thomas refused.

¶ 9        Thomas had an ongoing dispute with the School Board regarding Thomas's request for the School Board to negotiate a new contract for him because his four-year contract expired on June 30, 2008. The School Board refused to include this item on the agenda until it understood the results of the audit. Ultimately, the findings in the audit report confirmed the School Board's belief Thomas was not competent to perform his duties as a superintendent.

¶ 10        In January 2008, Thomas and the School Board agreed Thomas should go on paid administrative leave because the School Board had serious concerns about his performance. On January 7, 2008, Deborah attended a School Board meeting and suffered a "panic attack." On January 8, 2008, Deborah's doctor signed a letter stating Deborah was suffering from an

"overwhelming stress reaction" and she should not return to the workplace for at least four weeks.

¶ 11            In a letter dated January 31, 2008, the School Board notified Thomas of its decision to not renew his contract.  On April 3, 2008, the School Board notified Deborah of its decision to not renew her contract.  Plaintiffs' contracts were due to expire June 30, 2008.

¶ 12            During May and June 2008, plaintiffs filed applications to obtain nonoccupational disability benefits.  Deborah's application stated she suffered from "severe anxiety," "panic attacks, migraines, inability to sleep, [and] inability to concentrate."  Thomas claimed "psychological injury" as the nature of his disability.  Dr. William Clark and Dr. Stuart Greenfield diagnosed Deborah and Thomas, respectively, as suffering from "clinical depression, generalized anxiety, and post[-]traumatic stress disorder."  In a letter to TRS, Dr. Clark stated Thomas's symptoms "are acutely worsened by contact with teaching settings."

¶ 13            In August 2008, TRS notified Deborah by letter she would begin receiving nonoccupational disability benefits under section 16-149 of the Pension Code (40 ILCS 5/16-149 (West 2008)) in the amount of $3,127.20 per month retroactive to February 16, 2008.  In September 2008, TRS also granted Thomas nonoccupational disability benefits in the amount of $3,879.13 per month retroactive to July 1, 2008.  TRS enclosed a pamphlet, "Brochure 36 Your Nonoccupational Disability Benefit," which described section 16-149's provisions.  Brochure 36 states, in pertinent part, as follows:

            "You may not teach for any employers not covered by TRS

            or [the State University Retirement System of Illinois (SURS)].

            This includes tutoring and substitute work.

                        ***

If you wish to return to teaching on a limited basis, you must contact TRS to request a Limited Return to Work Program form. This form must be completed and returned to TRS prior to your return to teaching. TRS will acknowledge receipt of the form and confirm your eligibility."

¶ 14    In August 2008, TRS sent a letter to Deborah, apparently in response to her inquiry regarding the possibility of returning to work in the fall. The letter tracks the language in Brochure 36, stating in part:

"If you plan to return to teaching, including substitute teaching, this fall following your temporary disability, please call our Member Services Division ***. By contacting us first, you will help avoid any overpayment of benefits to you. If we are not notified of your return to active service and continue to issue benefits, you will be responsible for repaying any unearned disability benefits plus interest.

***

Individuals who have received a TRS disability benefit for one year or more may be eligible to participate in the Limited Return to Work Program. *** On a limited basis, you may tutor, substitute, or part-time teach for employers covered under [TRS] or [SURS] without loss of your disability benefit as long as your combined earnings from your teaching and your disability benefit

do not exceed 100 percent of the salary rate upon which the benefit was based.

If you plan to return to teaching on a limited basis, you must contact us to request a limited Return to Work Program Certification form. This form must be completed and returned to us prior to your return to teaching. We will acknowledge receipt of the form and confirm your eligibility.

This Law applies to all members receiving nonoccupational disability benefits, occupational disability benefits, and disability retirement annuities."

¶ 15    Deborah's disability benefits expired on February 12, 2009, and TRS informed her she would receive disability retirement annuity benefits pursuant to section 16-149.2 of the Pension Code (40 ILCS 5/16-149.2 (West 2008)) in the amount of $2,736.30, effective February 13, 2009. Thomas's disability benefits expired on June 11, 2009, and TRS informed him he would receive $3,409.99 per month in disability retirement benefits effective June 12, 2009. TRS enclosed a pamphlet, "Brochure 31 Your Disability Retirement Annuity," describing section 16-149.2's provisions. Brochure 31 advised annuitants they "may not teach for any employers not covered by [TRS]" and benefits will continue until "your disability ceases, you resume teaching, *** or you are eligible and apply for an age retirement annuity."

¶ 16    In April 2009, plaintiffs submitted to TRS their annual disability questionnaires. The top of the form asks annuitants to certify whether they are disabled, employed, or self-employed. Plaintiffs checked "No" for all three questions. The middle of the form asks annuitants who were employed to provide additional information about their employer.

Although plaintiffs indicated they were not employed, they each stated they worked for Olivet Nazarene University, at 1 University Ave., Bourbonnais, IL 60914, from February 2, 2009, to April 6, 2009, and earned $2,199.

¶ 17    In March 2010, TRS began investigating plaintiffs' employment at Olivet Nazarene University. In response to TRS' request, Thomas sent a job description for the position of adjunct web-based instructor. The job description states, in pertinent part, as follows:

"The instructor will prepare by thorough reading and understanding of the course materials and supplemental materials.

* * *

The instructor is available to answer student questions and does so in a timely manner so that students can continue with their personal studies of the course material.

The instructor checks to ensure that students have posted a substantial response each week to verify 'attendance' for that week's class session on-line.

The instructor gives feedback to student responses and grades submitted assignments.

The instructor posts grades on-line in the course system.

The instructor is the direct line of communication for the students if they are experiencing concerns with the on-line system or any of the curricula. Should the instructor not be able to rectify the student's concerns, the instructor should notify the Graduate Studies staff.

The instructor is responsible to complete the final grade sheets and fax them to the Graduate Studies staff no later than one week after the close of the 8 session course."

¶ 18    In a letter dated March 15, 2010, Ryan D. Spittal, dean of the School of Graduate and Continuing Studies, informed TRS Thomas worked at Olivet Nazarene University as a "presenter and instructor" from January 28, 2009, until March 23, 2009. The record also shows he worked during the fall 2009 semester from September 21, 2009, through November 9, 2009. In addition, TRS received a letter dated May 20, 2010, from Anna Benoit, human resources clerk, stating Deborah taught in Olivet Nazarene University's "distance learning/online program" from February 2, 2009, to March 23, 2009, and from September 21, 2009, to November 9, 2009.

¶ 19    TRS notified plaintiffs they were no longer eligible to continue receiving disability benefits under section 16-149 of the Pension Code. 40 ILCS 5/16-149 (West 2008). The letters explained, "[a]ccording to the information provided, you were an instructor and the job duties clearly indicated that you answered student questions, checked attendance, provided feedback and graded assignments." TRS found Thomas was overpaid benefits from January 28, 2009, through February 28, 2010, and demanded he reimburse it $46,959.91—$17,520.33 for nonoccupational disability benefits and $29,439.58 for disability retirement annuity benefits. In April 2010, this amount was corrected to reflect deductions taken from his annuity for teachers' retirement insurance; the correct amount is $44,245.22. TRS determined Deborah was overpaid benefits from February 2, 2009, through May 31, 2010, and demanded reimbursement of $37,218.61—$1,228.54 for temporary disability benefits and $35,990.07 for disability retirement benefits.

¶ 20    Plaintiffs appealed the staff determination to the TRS Board. 80 Ill. Adm. Code 1650.620 (2000). Plaintiffs and TRS filed cross-motions for summary judgment on the issue of whether plaintiffs' employment at Olivet Nazarene University violated sections 16-149 and 16-149.2 of the Pension Code. 40 ILCS 5/16-149, 16-149.2 (West 2008). In February 2012, a hearing was conducted before the Hearing Committee. In April 2012, the Hearing Committee issued a written recommended decision upholding the TRS staff's determination. It found plaintiffs lost their eligibility under section 16-149.2(a) because they "were both 'employed… in an equivalent capacity as a teacher in a … private … university' in derogation of [section] 16-149.2(a)" of the Pension Code (40 ILCS 5/16-149.2(a) (West 2008)). The Hearing Committee ordered plaintiffs to reimburse TRS for the nonoccupational disability and retirement disability annuity benefits they received after they began teaching at Olivet Nazarene University.

¶ 21    In August 2012, the TRS Board voted to uphold the Hearing Committee's recommended decision. Plaintiffs petitioned for administrative review (735 ILCS 5/3-101 *et seq.* (West 2008)). In April 2014, the circuit court affirmed the TRS Board's decision.

¶ 22    This appeal followed.

¶ 23                          II. ANALYSIS

¶ 24    On appeal, plaintiffs argue the TRS Board erred by terminating their disability benefits. They assert the pertinent sections of the Pension Code are ambiguous and inconsistent. 40 ILCS 5/16-149, 16-149.2 (West 2008). They further contend section 16-149, not section 16-149.2, applies to their case because they were receiving temporary disability benefits at the time of their alleged employment. Last, plaintiffs argue their disability benefits should not be terminated under section 16-149(c) because they were not gainfully employed at Olivet Nazarene University.

¶ 25                          A. Standard of Review

¶ 26         Pursuant to section 16-200 of the Pension Code (40 ILCS 5/16-200 (West 2008)),

we review the TRS Board's decision in accordance with the Administrative Review Law (735

ILCS 5/3-101 to 3-113 (West 2008)).  Accordingly, we review the decision of the administrative

agency, not the circuit court.  *Kildeer-Countryside School District No. 96 v. Board of Trustees of

the Teachers' Retirement System*, 2012 IL App (4th) 110843, ¶ 20, 972 N.E.2d 1286.

¶ 27          Summary judgment is appropriate only where "the pleadings, depositions, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  735

ILCS 5/2-1005(c) (West 2008).  Where the parties have filed cross-motions for summary

judgment, they agree no genuine issue as to any material fact exists and only a question of law is

involved, and they invite the court to decide the issues based on the record.  *Tri-State Coach

Lines, Inc. v. Metropolitan Pier & Exposition Authority*, 315 Ill. App. 3d 179, 189, 732 N.E.2d

1137, 1145 (2000).  We review the grant of summary judgment *de novo*.  *Board of Trustees of

the Teachers' Retirement System of Illinois v. West*, 395 Ill. App. 3d 1028, 1032, 916 N.E.2d 648,

652 (2009).  This case involves a question of statutory interpretation, which we also review

*de novo*.  *First American Bank Corp. v. Henry*, 239 Ill. 2d 511, 515, 942 N.E.2d 1262, 1265

(2011).

¶ 28                   B. Sections 16-149 and 16-149.2 of the Pension Code

¶ 29         The issue before us is whether plaintiffs' disability benefits, provided by two

different sections of the Pension Code, were properly terminated as a result of their employment

as adjunct web-based instructors at Olivet Nazarene University.  The resolution of the issue

requires us to engage in statutory construction.  The primary objective in construing a statute is

- 10 -

to ascertain and give effect to the legislature's intent. *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 15, 963 N.E.2d 918. "Legislative intent is best derived from the language of the statute itself, which, if unambiguous, should be enforced as written," without resorting to other aids for construction. *Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund*, 216 Ill. 2d 590, 595, 837 N.E.2d 876, 879 (2005). "Additionally, the entire statute must be read as a whole, considering all relevant parts." *First American Bank Corp.*, 239 Ill. 2d at 516, 942 N.E.2d at 1265. "Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *Chicago Teachers Union*, 2012 IL 112566, ¶ 15, 963 N.E.2d 918. "As a general rule, we accord deference to the interpretation of a statute by the agency charged with its administration." *Mattis v. State Universities Retirement System*, 212 Ill. 2d 58, 76, 816 N.E.2d 303, 313 (2004). However, an agency's interpretation is not binding and will be rejected if it is erroneous. *Id.* Pension statutes are to be construed liberally in favor of the rights of the pensioner. *Kanerva v. Weems*, 2014 IL 115811, ¶ 55, 13 N.E.3d 1228.

¶ 30         TRS was created to provide disability and retirement benefits for its members. 40 ILCS 5/16-101 (West 2008). Section 16-149(a) provides nonoccupational disability benefits to members who are incapacitated to perform their duties as a teacher and whose incapacity commenced while they were employed as a teacher. 40 ILCS 5/16-149(a) (West 2008). A member who receives nonoccupational disability benefits for the maximum period or who requests their disability benefits be terminated may be retired on a disability retirement annuity. 40 ILCS 5/16-149(c) (West 2008). Section 16-149.2(a) provides disability retirement annuity benefits to members who remain disabled under the standard of disability provided in section 16-149. 40 ILCS 5/16-149.2(a) (West 2008). Sections 16-149 and 16-149.2 set forth various

restrictions and eligibility requirements for receiving disability benefits. 40 ILCS 5/16-149, 16-149.2 (West 2008).

¶ 31     Here, the parties dispute the interpretation of sections 16-149 and 16-149.2 of the Pension Code. Section 16-149 provides, in relevant part, as follows:

"The benefit is not payable to a member who is receiving or has a right to receive any salary as a teacher, or is employed in any capacity as a teacher by the employers included under this System or in an equivalent capacity in any other public or private school, college or university, except as provided in Section 16-149.6.

* * *

(c) Effective January 1, 1988, the disability benefit shall continue until the time one of the following events first occurs: (1) disability ceases; (2) the member requests termination of the benefit; (3) the aggregate period for which disability payments made during the member's entire period of service equals 1/4 of the total period of creditable service, not including the time he or she has received the disability payments; or (4) the member is engaged or found to be able to engage in gainful employment, other than limited employment under Section 16-149.6." 40 ILCS 5/16-149 (West 2008).

Subsection (a) of section 16-149.2 provides as follows:

"A disability retirement annuity shall not be paid during any period for which the member receives benefits under Section 16-133,

- 12 -

Section 16-149, or Section 16-149.1 or has a right to receive a salary as a teacher, or is employed in any capacity as a teacher by the employers included under this System or in an equivalent capacity in any other public or private school, college or university, except as provided in Section 16-149.6."  40 ILCS 5/16-149.2(a) (West 2008).

¶ 32        Plaintiffs assert their benefits should not be terminated because the language in sections 16-149 and 16-149.2 of the Pension Code (40 ILCS 5/16-149, 16-149.2 (West 2008)) is ambiguous and inconsistent.  We disagree.

¶ 33        In our view, the words in the sections above are clear, and the language is not susceptible to more than one reasonable interpretation.  Sections 16-149(a) and 16-149.2(a) plainly state disability benefits are not payable to members who are employed in any capacity as a teacher by a TRS employer or any other public or private school, college, or university.  These provisions were intended to prevent members from receiving disability benefits while earning money as a teacher.  If the rule were otherwise, a member could receive an unfair windfall by taking a leave of absence from his or her regular TRS-covered position, collecting disability benefits from TRS, and securing a teacher's salary elsewhere.  The General Assembly's obvious goal in enacting the rule was to prevent members who are well enough to perform their duties as teachers from collecting disability benefits while receiving a salary as a teacher.  To hold otherwise would allow members in plaintiffs' position to earn an unfair premium the legislature did not contemplate.  See *LaBelle v. State Employees Retirement System*, 265 Ill. App. 3d 733, 737, 638 N.E.2d 412, 416 (1994) (gainful employment limitation is intended to prevent a member of TRS from receiving disability benefits while earning money in some work-related

endeavor). Accordingly, plaintiffs were prohibited from working as teachers while receiving disability benefits under sections 16-149 and 16-149.2. No principle of statutory construction supports a contrary view.

¶ 34        Plaintiffs argue the TRS Board erred by improperly applying section 16-149.2 to their case. They argue the TRS Board should have applied section 16-149 because they were receiving nonoccupational disability benefits at the time of their alleged employment. We disagree. Sections 16-149 and 16-149.2 bestow two different benefits with different criteria and different restrictions. If we adopted plaintiffs' narrow interpretation, it would allow members to circumvent the legislature's goal of preventing unfair windfalls. Since plaintiffs received benefits under each section, we apply section 16-149 to the extent they received nonoccupational disability benefits and section 16-149.2 to the extent they received retirement disability benefits. We note, the TRS Board's failure to cite section 16-149 does not change the outcome of this case since we review summary judgment orders *de novo* and may affirm on any basis the record permits, even if not the ground on which the TRS Board based its ruling. *Reed v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 395 Ill. App. 3d 1, 7, 917 N.E.2d 1073, 1078 (2009). Since sections 16-149 and 16-149.2 contain the same prohibition against teaching (except as provided for in section 16-149.6), the result in this case is the same.

¶ 35        Plaintiffs further contend the phrase "benefit is not payable" in section 16-149(a) is ambiguous because it is susceptible to two or more reasonable interpretations—*i.e.*, whether its application is prospective or retroactive. We disagree. In considering section 16-149 in its entirety (*First American Bank Corp.*, 239 Ill. 2d at 517, 942 N.E.2d at 1265), the plain and ordinary wording shows the penalty for returning to work as a teacher is prospective in application. Nothing in section 16-149 establishes the penalty applies retroactively, which would

mean the disabled member must pay back all of the benefits he or she received. The legislature did not want members who violated section 16-149(a) to forfeit all of their disability benefits. See *LaBelle*, 265 Ill. App. 3d at 738, 638 N.E.2d at 417 (remanding for TRS to "determine 'the date on which [plaintiff] engage[ed] in gainful employment' " (quoting 40 ILCS 5/14-124 (West 1992)). Here, TRS determined Thomas and Deborah became ineligible on January 28, 2009, and February 2, 2009, respectively, and ordered reimbursement for benefits paid after those dates.

¶ 36            Plaintiffs also argue the phrase "benefit is not payable" is inconsistent with other language in the statute. For example, plaintiffs note section 16-149(c) uses the phrase "benefit shall continue until," and section 16-149.2 uses the phrase "such annuity shall cease." Plaintiffs appear to argue if the legislature uses certain words in one instance and different words in another, it intends different results. *Gutraj v. Board of Trustees of the Police Pension Fund*, 2013 IL App (2d) 121163, ¶ 14, 992 N.E.2d 605. We are not persuaded. We can discern no reason why the minor differences in the statutory phrases "benefit is not payable," "benefit shall continue until," and "such annuity shall cease" should require different interpretations. See *Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303, 322, 950 N.E.2d 1051, 1062 (2011) (" '[W]here the same, or substantially the same, words or phrases appear in different parts of the same statute they will be given a generally accepted and consistent meaning, where the legislative intent is not clearly expressed to the contrary.' " (quoting *Moran v. Katsinas*, 16 Ill. 2d 169, 174, 157 N.E.2d 38, 40 (1959))). Our reading does not raise concerns about redundancy or surplusage sometimes associated with reading dissimilar terms to mean the same thing. Only one reasonable interpretation of these phrases exists—a member loses their right to continue receiving disability benefits if they work in any capacity as a teacher (except as provided in section 16-149.6). Thus, the language is not ambiguous. By giving the same meaning to the

phrases "benefit is not payable," "benefit shall continue until," and "such annuity shall cease," we give meaning and effect to both sections, as we must do if reasonably possible.

¶ 37 Finally, we reject plaintiffs' assertion the word "shall" in section 16-149(c) makes it the only section under which nonoccupational disability benefits may be terminated. If we construe subsection (c) to be the only section under which nonoccupational disability benefits may be terminated, the resulting construction would render the language in subsection (a) mere surplusage. See *Arnold v. Board of Trustees of the County Employees' Annuity & Benefit Fund*, 84 Ill. 2d 57, 62, 417 N.E.2d 1026, 1028 (1981) (indicating a "strong presumption against finding statutory language to be mere 'surplusage' "). In light of the Pension Code's salutary policy of preventing TRS members from receiving an unfair windfall, which is clearly and repeatedly expressed throughout the Pension Code's many articles, we reject any argument the legislature intended subsection (c) to be the only section in which nonoccupational disability benefits may be terminated. Reading section 16-149 as a whole, and giving meaning to every word and paragraph, we find subsection (a) prohibits disabled pensioners from working in any capacity as teachers (except as allowed under section 16-149.6), while subsection (c) sets forth four additional events which stop the payment of nonoccupational disability benefits. To the extent plaintiffs argue they were not "gainfully employed," we note gainful employment applies only to nonteaching employment.

¶ 38 The case *sub judice* presents no genuine issue of material fact as to whether plaintiffs were employed as teachers at Olivet Nazarene University while they were receiving disability benefits. Such a situation falls squarely within the scope of what sections 16-149(a) and 16-149.2(a) were designed to prevent. Since plaintiffs' right to receive disability benefits terminated on the date they became employed as adjunct web-based instructors, the TRS Board

correctly determined it was entitled to reimbursement for benefits paid after their employment. If plaintiffs wanted to work as teachers, they should have contacted TRS to request a "Limited Return to Work Program" form pursuant to section 16-149.6. This information was explained in Brochures 31 and 36, and in an August 2008 TRS letter.

¶ 39                                                III. CONCLUSION

¶ 40        Based on the foregoing reasons, we affirm the circuit court's judgment affirming the TRS Board's decision terminating plaintiffs' disability benefits and ordering reimbursement of overpaid benefits.

¶ 41        Affirmed.